Cunningham, Judge.
•In order to make as clear as possible the discussion of the points presented for consideration by this appeal, we shall first state chronologically the historical facts out of which they spring. The italics used throughout are ours.
*333 In January, 1886, tlie council of the city of Denver passed an ordinance granting to The Denver Eailroad and Land Company the right to lay and operate a single track of three feet gauge on a short section or portion of Wewatta street, the distance on said street covered by the grant being but a few blocks. Said track was to be used for general steam railway purposes. Sections 6 and 7 of said ordinance read as follows:
“Sec. 6. That the existence and dtiration of the privileges hereby granted is upon the condition that the tracks of said company shall be completed and that trains shall be in actual and regular use each day for the carriage of* freight and passengers within six months from the date of the publication of this ordinance; that the duration of the said privileges shall only continue so long as trains are in regular use as aforesaid, otherwise this ordinance is to be null and void, and the said privileges forfeited, unless legally obstructed by adverse proceedings.
Sec. 7. That the privileges hereby granted to said company shall not be subject to transfer or assignment either voluntarily or by operation of law, except by the consent of the city council of the city of Denver first had and obtained.”
In March of the year following, 1887, an ordinance was passed by the said city council, recognizing a change of the corporate name from “The Denver Eailroad and Land Company” to “The Denver Railroad, Land and Coal Company.” By said ordinance of 1887 the company was also given the right to make the road standard gauge by laying a third rail and to extend the same on Wewatta street *334 some five or six blocks farther than by the first ordinance it was permitted to do.
Sec. 3 of the ordinance of 1887 reads as follows :
“Sec. 3. That the terms and requirements of said ordinance No. 8 of the series of 1886, so far as applicable, shall apply to and constitute the term and requirements in the laying of said additional rail and in the extension of the track of said company within the city and the provisions in said ordinance as to laying the tracks in the center of the street, placing the same at grade, and the changing, elevating or lowering the same by requirement of the city council, and in general all the provisions of said ordinance No. 8 shall be held to apply specifically to the additional grant or franchise herein conferred upon said company.”
At the November election in 1902, an amendment to the constitution of this state was adopted, which amendment is known as art. XX, the last paragraph of sec. 4 of said amendment reading as follows:
“No franchise relating to any street, alley or public place of the said city and county shall be granted except upon the vote' of the qualified tax paying electors, and the question of its being granted shall be submitted to such vote upon the deposit with the treasurer of the expense (to be determined by said treasurer) of such submission by the applicant for said franchise.”
This amendment, by proclamation of the governor duly issued, went into effect on or about December 1st, 1902. On October 5th, 1903, almost a *335 year after, the adoption of the aforesaid amendment, the city council, proceeding under the old city charter, passed an ordinance purporting to grant to defendant company a right of way or franchise over certain streets and alleys of said 'jeity and county of Denver, on which it had not theretofore claimed or been granted any privileges. This ordinance was to take effect upon the company accepting the conditions of the same, among which was one annulling the Wewatta street franchise or grant. We assume, nothing,in the récord to the contrary appearing, that the company accepted the conditions of the ordinance, and relinquished whatever right it possessed in virtue of the former ordinance in and to the Wewatta street grant. The right of way which the last ordinance attempted to vest in the company passed along and over a portion of Cline street in the city and county of Denver, on which is a two-story brick hotel property, in which plaintiff resided, and which he owned and operated as a hotel.
The amendment of the constitution referred to, provides, among other things, for the adoption of a new charter by the consolidated municipality of the city and county of Denver, which its adoption created, but the new charter had not been adopted at' the time of the passage of the third ordinance above referred to. The amendment contained a provision reading as follows:
‘ ‘ The charter and ordinances of the city of Denver as the same shall exist when this amendmént takes effect, shall, for the time being only, and as far as applicable, be the charter and ordinances of the city and county of Denver.”
*336 Notwithstanding the conditions in sec. 7 of the ordinance of 1886, forbidding the grantee or beneficiary therein named, to transfer the franchise by said ordinance granted it, the corporation appears to have given a trust deed, early in 1887, which included said franchise. This trust deed was later foreclosed, and it is admitted that whatever rights appellee ever hád in and to the Wewatta street grant were transferred to it by one Burke, who bought the property under the foreclosure of the trust deed aforesaid.
Although almost twenty years had elapsed between the date of the Wewatta street grants, and the passage'of the ordinance of 1903, no attempt appears to have been made by the company to con-, struct a road on Wewatta street, or otherwise comply with sec. 6 of the ordinance of 1886. Whatever right appellee has in Cline street is dependent wholly upon the last of the three ordinances, that is, the one passed in 1903.
The plaintiff, Ward, filed his bill of complaint in the district court, alleging that the defendant company was preparing to grade and lay its tracks across Cline street, at a considerable elevation above the natural surface of said street, in the vicinity of his property, in such a manner as to intercept travel, seriously curtail his trade, and thereby greatly diminish the income which he enjoyed therefrom, and depreciate the market value of his real estate, consisting of six lots and the hotel building. He further charged that the defendant was thus proceeding in the construction of its road bed and in the laying of its tracks, without warrant, right or authority. He asked that the defendant *337 be enjoined and restrained from proceeding with said work. A temporary restraining order was granted. The defendant answered, asserting, among other things, its right to lay the track tinder the ordinance of 1903. A hearing was had, resulting in the dissolution of the temporary restraining order, and the dismissal of plaintiff’s bill, from which order and decree the plaintiff prosecutes this appeal. No evidence was offered on the hearing by the defendant. The evidence produced by the plaintiff clearly established his contention that the completion of defendant’s road across Cline street would result in substantial damage to his business, reducing most seriously the daily income which he derived from his hotel property, and depreciate the market value of his real estate (estimated to be $50,000) fully one-half.
1. If the ordinance of 1903 was valid, then the judgment of the trial court is manifestly correct, and plaintiff’s relief is not by injunction. The validity of the ordinance turns upon the proper construction of that portion of art. XX of the constitution which provides for the submission of all proposed franchises relating to streets and alleys to a vote of the qualified tax paying electors.
Succinctly stated, defendant’s position as to art. XX is, that the power of the city and county of Denver to grant a franchise remained unchanged and unaffected by the amendment, until the new charter of the city and county of Denver had been adopted and gone into effect. In other words, the amendment constituted the fundamental law of the city and county of Denver only after the taking effect of the new charter. Any other interpretation *338 of the amendment, say counsel for the defendant, would give a retrospective effect to it, and would make of Art. XX an amendment to the old and then existing charter of the city of Denver, which, by the amendment, was made the charter of the newly created municipality, as far as applicable. Plaintiff insists that by the adoption of art. XX, all power and authority to grant such franchises as the one under consideration was eo instanti taken from the city council and vested in the tax paying electors. In short, the plaintiff affirms, and the defendant denies that the provision of the amendment pertaining to franchises was self-executing.
Art. XX of the constitution has received the attention of the. courts of review of this state upon several occasions. In McMurray v. Wright, 19 Colo. App., 22, Thompson, P. J., speaking for the court, said:
“The- old charter of the city of Denver, in so far as it is the charter of the city and county of Denver, is likewise to be considered in determining the extent of the council’s authority. But that charter is not the charter of the city and county except qualifiedly. It is such a charter only in so far as it is applicable to the constitution of the neto corporation.”
Here we find an answer to the question: What is meant by the phrase as used in art. XX, ‘ ‘ as far as applicable?” That is, applicable to what? The court of appeals, in the quotation just made from the McMurray case, says it means “applicable to the constitution of the new corporation,” and it also says that the old charter is only qualifiedly the charter of the new corporation. It would seem *339 plain, from, this announcement of the court of appeals, that art. XX, upon its adoption, became at once effective,- at least in certain particulars, and required no legislation to put it into effect. In other words, defendant’s contention that it was intended as a part of the fundamental law of the new charter, of the city and county of Denver only, and was intended merely as a guide to the charter convention in framing the new charter, would seem unsound. In Hallett v. Denver, 46 Colo., 487, the supreme court had under consideration sec. 4 of art. XX. In this case it was contended by the plaintiff that during the interim between the disincorporation of the former municipality and the adoption by the new city of a new charter and ordinances, the city council was without authority to make public improvements (in that case levying sidewalk assessments). While the supreme court in the Hallett case, found that the city council might, by virtue of their authority under the old charter, properly levy such assessment, it reached that conclusion upon the gronnd, as announced on page 489, that art. XX contained nothing which makes inapplicable to the new city during this interim its possession of the power to initiate and complete public improvements. On the contrary, by a strong implication at least, as the court pointed out, art. XX directly provided for such improvements by the continuance in office of the board of -public works until its successor had been elected and qualified. As.the court announced in the Hallett case, the board of public works would be a useless body were not special powers at the time and by the amendment conferred upon it, since the board'of public works was *340 entrusted, under tlie old ordinances, with the supervision of public works like that involved in the Iiallett case. The supreme court, in that case, at page 489, announces squarely that the phrase in sec. 4 of art. XX, “so far as applicable” has reference to art. XX, thus agreeing with the court of appeals in the McMurray opinion. In the Iiallett case the supreme court used this language:
“If there is nothing in that article (art. XX) which renders inapplicable the charter and ordinances of the former city, then they are the charter and ordinances of the new city and county of Denver for the time being only.”
It would seem plain, by a parity of reasoning, that the supreme court would have held, had the question been before it, that if there was anything in art. XX which rendered inapplicable the charter and ordinances of the former city, then such charter and ordinances would not become the ordinances of the new city and county of Denver for the time being, or at all.
Counsel for defendant well say: “It was, however, foreseen by the legislature that some time must necessarily elapse, and that a long time might elapse, before a new charter would be adopted.” The prescience of the legislature in this behalf was abundantly vindicated by the events which followed. The interpretation insisted upon by defendant’s counsel would make the provision of the 20th amendment read, in effect, as follows:
“No franchise relating to any street, alley o.r public place of the said city and county ‘shall be granted, except upon the vote of the qualified tax paying electors, unless those desiring such from *341 chise can induce the council to act upon the application before the new charter shall be adopted and take effect.”
We are unwilling to place this interpretation upon the language of art. XX, and we cannot bring ourselves to believe that such was the legislative intent, or the understanding of the voters when the amendment was acted upon at the polls. The power left remaining in the old officials, and in the old charter, was designed for temporary purposes only, and to prevent governmental chaos in the new municipality. Hence we think such power and authority should receive a strict construction; but the amendment to the constitution, being designed to protect the interests of the people, should be liberally construed, to the end that its beneficent designs may be effectuated. If the language of art. XX should receive the construction contended for by defendant, then the old council was left in a position to dispose of franchise privileges, during the interim between the adoption of the amendment and before the taking effect of the new charter, to an extent that could practically nullify the purpose of the amendment for twenty years. This interpretation would also operate to prevent, or at least to delay, the adoption of the new charter indefinitely, or might well do so, at least, while the adoption of the interpretation contended for by the plaintiff would tend greatly to accelerate its adoption.
The prime purpose of the constitutional amendment was to bestow upon the inhabitants of the city of Denver, and certain surrounding territory, a very greatly increased measure of home rule, and the object of the provision now under consideration *342 was to give the tax paying electors of the aforesaid territory absolute control over the granting of franchises. It must be clear that the legislature in framing and submitting the amendment, and the people in adopting it, had these purposes in mind. Therefore, it cannot be assumed that either the legislature or the people deliberately incorporated in or omitted from the amendment provisions calculated to work powerfully against and greatly delay the adoption of the charter for which the amendment provided, and which was one of its important purposes.
Again: If the old charter provisions regulating the granting of franchises be held to be operative after the adoption of art. XX and before the adoption of the new charter, then the city council was given a tremendous power which it had never there-. tofore enjoyed, namely, the granting of franchises over the streets and alleys and public places of all that territory which had not, before the adoption of the amendment, constituted a part of the city of Denver, but after its adoption, had become a part of the new municipality, and thus art. XX would in truth and in fact become an amendment to the old charter, at least in effect.
In McMurray v. Wright, supra, Presiding Judge Thompson, uses the following language:
“The mayor and the persons composing the council of the city of Denver, became by virtue of the amendment the mayor and council of the city and county of Denver. The mayor and members of the council, as well as all other officers of the new corporation, derived their title to office solely from the amendment; they have, therefore, such powers *343 as it expressly confers, or are legitimately deducible from it and consistent with it, and no other.”
We think it can hardly be seriously contended that anywhere within the four corners of the amendment (from which the city council, who attempted to. pass the ordinance of 1903, “derived their title to office”) is power expressly conferred upon said council to grant a franchise such as the one in question; no more do we think it can be contended that there will be found any such authority legitimately deducible from the amendment, and consistent with it.
In People v. Adams, 31 Colo., 476, the twentieth amendment was before the supreme court for interpretation. In this case the governor, proceeding upon the assumption that sec. 45 of the old charter of the city of Denver, in so far as it pertained to his power to remove certain city officials, was still in force and applicable to the condition then existing (the new charter not yet having been adopted) attempted to remove certain of the city officials from office and to appoint successors in their place. We have examined the original briefs filed in that case, and also the briefs filed on rehearing. Brilliant counsel pressed the governor’s contention upon the court. It was pointed out that the amendment made no provision for the removal of officers, and if the court should hold that sec. 45 of the old charter, which permitted the governor to remove certain officers of the city, had been annulled by the adoption of art. XX, then the power of removal rested nowhere. A most appalling picture was painted, by the attorneys representing the governor, of the results that might follow such a con *344 structi on of the act. The attention of the court was drawn to the fact that, no matter how corrupt or inefficient the city officials might be, they must remain in power indefinitely, and even though they might have been stricken with insanity, or had removed permanently from the city and state. Even the police force, it was contended, could not, under such interpretation of art. XX, be diminished by the discharge of a single patrolman. Yet the court, in the face of this showing, answered thus:
“The avowed object of the general assembly in submitting, and the presumed intent of the people in ratifying this amendment must be given effect if the language therein employed will allow, even if the result be a withdrawal of restraints upon the officers which heretofore have been deemed by the general assembly expedient to prescribe, or the consequences destructive of high efficiency in the discharge of public duty.”
Mr. Chief Justice Campbell, speaking for the court, continuing, said:
“It is the duty of every member of the court to give effect to the article in accordance with the intent of its framers as far as it can be done consistent with the language in which that intent has been manifested.”
And again:
“Certainly, one object was to take from the general assembly all control of the local affairs of the inhabitants of the territory included within the new body politic, and to withdraw from the governor the power which he theretofore possessed to appoint and remove the members of its fire and police board.”
*345 And further, Chief Justice Campbell said:
“Doubtless it is wise to lodge somewhere the power of removal from office, and usually it is safe to entrust it to the appointing power; * * * While we appreciate the force of the argument of learned counsel that power of amotion should be lodged somewhere, and that, without such check upon official action, gross abuse of authority may be perpetrated by public officers, still, courts cannot interpolate such absent authority into a statute from which it is omitted, and thus remedy defective legislation. ’ ’
In concluding the opinion in the Adams case, at page 482, Chief Justice Campbell used this language :
“The language of sec. 4, by which the charter of the old city was continued in force, does not prolong the life of this removal clause, for it is not only inconsistent with the right of the defendants to hold until their successors are elected, but it is inapplicable to the condition confronting the governor, since the power of removal therein delegated accompanies only appointments made by the governor himself.”
So, if the annulling of any portion of the old charter amounts, as counsel for defendant seem to insist, to its amendment, then the supreme court has clearly held, in the Adams case, that art. XX did amend the old charter. But it is not profitable to draw nice distinctions between annulling and amending that instrument. Certain it is that both the court of appeals and the supreme court have held that upon the taking effect of art. XX, the old charter lost much of its vitality, and the city conn *346 oil, of course,' lost correspondingly in the matter of its authority.
Many authorities are cited hy counsel- on behalf of the defendant to support the elementary principle that a constitutional amendment cannot operate retrospectively. No contention is made on behalf of plaintiff, indeed none could be made, that if the ordinance of 1903 had been adopted prior to the November election of 1902, it would not be in every respect valid, in so far as art. XX of the constitution is concerned. Therefore, clearly these authorities are not in point.
It is true, as pointed out by defendant’s counsel, art. XX of the constitution makes no special provision for the calling and conducting of an election to vote on any proposed franchises. Neither did this amendment provide for the discharge or removal of unnecessary, inefficient or corrupt public officials during the interim between the adoption of the amendment and the new charter, but, as we have pointed out above, it was held by the supreme court in the Adams case that while it is wise to lodge somewhere the power of removal from office, courts cannot interpolate such absent authority in a statute from which it is omitted, and thus remedy defective legislation. We think it will be conceded that it was quite as important to the welfare of the city and county of Denver that corrupt or inefficient public officials should be removed from office as that a corporate franchise should be granted to the defendant in this case. Art. XX did provide a method for the speedy adoption of a charter whereby it, the amendment, could be supplemented so that franchises might, by a vote of the people, be granted. *347 We prefer the view which would operate to impede, temporarily, the granting of franchises, rather than the interpretation which would hold the constitutional amendment in abeyance while the friends and foes of a home rule charter fought out their differences in convention.
We reach the conclusion, without hesitancy or misgiving, that immediately upon the taking effect of art. XX, the power to grant franchises like the one in question was thereby transferred from the city council to the qualified tax paying electors of the new municipality. Hence it follows that the ordinance of 1903 was null and void, and “upon authority we hold that the ordinance in the case at bar was void and conferred no authority whatever upon the defendant, and can not be invoked to give-it protection.” D. & S. Ry. Co. v. Denver City Ry. Co., 2 Colo., 683.
2. It is contended on behalf of defendant that the ordinance of 1903, even if void as a franchise, nevertheless constitutes a valid permit or license which remained good as against plaintiff, and as against the city, until the same was revoked by the authority that attempted to make the grant, namely, the city. Under the law existing prior-do the adoption of art. XX, this contention may have been sound, that is, the council, having under the previous law, authority to make the grant, a defective attempt by it to grant a franchise might operate as a license or permit. But the law with reference to grants of this character was so radically and fundamentally altered by the constitutional amendment as to make prior decisions on this point inapplicable. The council, being wholly without authority to grant *348 a franchise in 1903, its abortive attempt so to do conferred no right whatever upon the defendant company. D. & S. Ry. Co. v. Denver City Ry. Co., supra. Especially is this true where the attempted grant was designed to confer a right on the company to construct the main line of its road over the streets of the city. The council being without power to make grants of this character, we are not called upon, under the facts disclosed by the record in this case, to consider and determine its power and authority to grant permits for local or limited incidental privileges such as that involved in the case of McPhee & McGinity v. U. P. Ry. Co., 158 Fed., 6, to which our attention has been directed.
3. Whether the defendant company had, for any reason, forfeited its right to occupy Wewatta street, or to construct its road thereupon, at the time of the passage of the ordinance in 1903, or whether any such right was ever acquired by the defendant company, are likewise questions not before us for consideration. Indeed, it is said in the brief of the defendant company that, “it is immaterial whether the appellee had any franchise on Wewatta street at the time the ordinance of 1903 was adopted! ’ ’ The company may have had power, under the charter and general law, to alter or change its route, as is contended in his behalf that it had, but it will not be seriously urged that such right was absolute, or that it could be exercised at will, and without regard to the vested rights of those who would be injured by such change. Nor could the company acquire such right from a legislative body which had, by a constitutional amendment, been de *349 prived of all authority in the premises. D. & S. Ry. Co. v. Denver City Ry. Co., supra.
4. It is next contended by the defendant company that the plaintiff may not maintain this action, because the defendant’s tracks about to be laid, would not pass directly in front of plaintiff’s prop-, erty; plaintiff’s property does not abut upon that portion of Cline street over which it is proposed to construct plaintiff’s tracks. It is alleged in the defendant’s answer, and. established by the proof, that the line of road or route as surveyed and located, crosses the east line of said Cline street at a point between sixty-five and seventy feet distant from the northwest corner and nearest point of plaintiff’s lots. The evidence shows that the line crosses Cline street at a point between plaintiff’s property and the stockyards, and crosses at such a grade as to make travel from the stockyards to plaintiff’s property impracticable, if not impossible. The greater part of plaintiff’s business, as shown by'the evidence, comes from those frequenting the stockyards or having business there.
In Railroad Co. v. Foley, 19 Colo., 280, appears the following:
“It is settled in this state that unlawful obstruction of a business street more or less remote from abutting property, if it causes a special injury thereto, entitles the owner of such property to recovery therefor.”
Citing Jackson v. Kiel, 13 Colo., 378. See also Brunswick Co. v. Hardey, 112 Ga., 604; 37 S. E., 889. Adams v. Ry. Co., 39 Minn., 288; 1 L. R. A. 493. Stetson v. Faxon, 19 Pick., 147; 31 Am. Dec., 123.
*350 Under these authorities it would seem that plaintiff’s right to maintain the action does not turn upon whether his property abuts directly upon defendant’s proposed line of road or not. It is sufficient, if the location of defendant’s tracks be such as to result in direct, serious and speéial injury to plaintiff’s property.
5. The only question remaining which we think demands consideration is as to the right of the plaintiff, under the pleadings and the proof, to injunctive relief. It is' stoutly contended, by counsel for the railroad company that plaintiff’s only remedy is an action at law for damages. Much of the defendant’s argument on this point is based upon the untenable assumption that the action of the city council in passing the ordinance of 1903 vested in it either a valid franchise or a revocable permit. If this position were sound, then many of defendant’s authorities, such, for instance, as Haskell v. Denver Tram. Co.; 23 Colo., 60; D. & S. R. Co. v. Domke, 11 Colo., 247, and D. U. P. R. Co. v. Barsuloux, 15 Colo., 290,. would be in point, and would seem to sustain its contention in this behalf. But we need not go out of our own state for authorities to -support the doctrine that the construction and maintenance of a railway over the streets of a city (especially a steam road), without authority, constitutes a public nuisance, and may be enjoined at the suit of any individual who suffers a special injury as a result thereof. In D. & S. R. Co. v. Denver City R. Co., supra, after holding that an ordinance and resolutions of the city council attempting to confer authority to construct a railway track was void, it is said:
*351 “What was the legal character of the acts of the defendants in the construction of a railway in Holladay and 23rd streets'? Upon the established fact we must say they created a public nuisance. If authorized by law, its acts might have been justified, no matter how "much inconvenience to the public they may have occasioned, but, being without right, no matter how little inconvenience this permanent appropriation of a part of the street may occasion, they cannot defend themselves from the charge of nuisance. The authorities for this position are consistent and uniform, and leave no doubt on the question. 14 N. Y., 524, and cases cited. * * * In this feature of the case the complainant is entitled to relief just so far as its allegations sustained by proof will justify a court of'equity in interferingán its behalf. In so far as it suffers from the wrongful acts of the defendants, in common with the public generally, it cannot have relief; but to the extent that its private rights are invaded or threatened by a wrong-doer, it is the duty of the court to protect it.”
In High on Injunctions, vol. 5 (4th ed.), sec. 828, it is said:
“Even where the road is being built without authority of law, it will not be enjoined at the suit of one who owns no real estate over or adjoining which it is to pass, and who will not be specially injured by its construction, but where the plaintiff owns real estate abutting upon a public street or alley, and will be subjected to injury differing in kind from that suffered by the public, such as the impairment of an easement in the highway as a means of ingress and egress to his property, result *352 ing in serious and substantial injury thereto, the rule is well settled that an injunction will lie to restrain the illegal and unauthorized construction of a railroad in the highway, as, for example, where the work is proceeding under an ordinance or license which the municipality has no power to grant.”
' In support of this statement, Mr. High cites numerous cases from Alabama, Minnesota, Tennessee and Missouri.
“Streets and highways cannot be obstructed or encroached upon by a railroad without lawful authority for such act, and where a railroad is constructed upon a street without such authority, it will constitute a public nuisance, and in such a case, one showing a sufficient injury by reason thereof will be entitled to bring an action to enjoin the same. ’ ’
Joyce Law of Nuisances (1906), sec. 246. In the third edition of Pomeroy’s Eq. Jur., vol. 5, sec. 478, the following is quoted from Wahle v. Reinbach, 76 Ill., 322:
“Where the injury resulting from the nuisance is in its nature irreparable, as when loss of health, loss of trade, or destruction of the means of subsistance, or permanent ruin to property, will ensue from the wrongful act or erection, courts of equity will interfer by injunction in furtherance of justice and the valid rights of property.”
Several other Illinois cases are cited by Mr. Pomeroy to support the above quotation.
Mr. Elliott, in his work on Eoads and Streets, at sec. 394, makes this statement:
“The destruction of valuabe property rights, *353 by raising the grade of a street, however, is more than a mere fugitive trespass, and an injunction will be awarded.” ;
The contention made that the right of the defendant to use the street could only be challenged by a proceeding in quo warranto brought on behalf of the city is effectually disposed of by Circuit Judge Woods, in the case of The General Electric Railway Co. v. Chicago I. & L. Ry. Co., 107 Fed., 771. The same case was also considered by the circuit court of appeals of the 7th circuit in the 98th Fed., 907, both opinions being by Judge Woods. In the course of a remarkably vigorous opinion in 107 Fed., 774, Judge Woods says:
“Ordinarily a void thing may be ignored by anyone concerned. On questions of public policy it has been ruled, and doubtless wisely, that an individual asserting only an injury for which suitable compensation may be obtained at law, may not attack a public ordinance formally adopted, and under which a public work, perhaps of great importance, is being prosecuted; but if the doctrine is to be applied when private injury is about to be inflicted, for which the relief obtainable at law could not be even approximately adequate, it becomes a bald denial of justice. The like of it has found recognition thus far, we believe, only in briefs, to which, in the face of criticism at the bar of the court, counsel have not shown an unflinching adhesion. * * * In the nature of things and on principle, there is the same right to go into equity for an injunction against a threatened irreparable injury as there is to go into a court of law to recover damages-for a compensable wrong. If the laying of the street rail *354 way be fully authorized, as by a valid ordinance, there can, of course, be no injunction, if there be no actual taking of property outside of the limits of the street; * * * but what good reason can there be for the application of that rule when the ordinance under which an inestimable damage is about to be inflicted is void? Why should there be an estoppel against denying the validity of the invalid — against denouncing as void an act which is in fact void, under which it is proposed to inflict an irremediable wrong? If there were no pretense of an ordinance or of other form of authority for the proposed invasion of the street, is it to be said that the owner of abutting property threatened with injury may not have relief by injunction, but must •look only to the uncertain and' insufficient remedies of the. law? Would a forged ordinance, put upon the records of the common council without the knowledge or consent of the body by whom it purported to have been enacted, be beyond impeachment except by a public prosecutor, who, as the supreme court of the state (Illinois) has held, could move only in the public interest, at the risk of the dismissal of the proceedings if shown to be for the protection of private rights — the only rights, in most instances, likely to be imperiled? But if the work of laying a street railway, prosecuted' without pretense of authority or under a forged ordinance, may be enjoined at the suit of one threatened with irreparable wrong, why should it not be enjoined in a like case if prosecuted under an ordinance which for any reason is illegal and void, not voidable merely"
*355 Judge Woods closes this feature of his discussion with the statement that:
“It is useless to talk of relief through the public prosecutor or attorney g’eneral of the state.” In the two opinions by Judge Woods, referred to, he had under consideration the case of Doane v. R. R. Co., 165 Ill., 510; 46 N. E., 520; 36 L. R. A., 97, a case that has attracted much attention, stnd one of the cases cited and relied upon by the defendant in this case. It is believed that the rule laid down in the Doane case has been, by construction, modified by the supreme court of Illinois itself. In Nelson v. Randolph, 202 Ill., 531; 78 N. E. 914, a case for obstructing a highway, it was held:
‘ ‘ Conceding that in order to maintain a suit by an individual to enjoin the obstruction of a public highway, some special or peculiar injury must be shown, the fact that members of complainant’s family are buried in the cemetery to which the highway leads, and that complainant and others have cared for the cemetery, are sufficient.”
The quotation is from the syllabus, which is supported by the text.
It is said by Judge Elliott, in his work on Roads and Streets (2nd ed.), in a note to sec. 394:
“It seems to us that the tendency of modern thought is to extend the remedy by injunction, and this, we believe to be wise and expedient.”
It must be clear that in the instant case plaintiff’s injury was a continuing one, in so far, at least, as it affected his trade or business, and the damage ensuing would be' impossible to definitely establish. Wrongs of this character the authorities universally hold to be cognizable at equity; The fact .that no *356 actual damage can be proved, so that in an action at law the jury could award nominal damages only, and such, an action at law would necessarily be ineffectual, often furnishes the very best reason why a court of equity should interfere in cases where the nuisance is a continuing one.
Platte Co. v. Lee, 3 Colo. App., 185. Medano. Ditch Co. v. Adams, 19 Colo., 328. Sylvester v. Jerome, 19 Colo., 128; 34 Pac., 760. City v. Manning, 43 Colo., 144. Angell Highways (2nd ed.), sec. 283. Pomeroy Eq. Jur. (4th ed.), vol. 5, sec. 516. Wahle v. Reinback, 76 Ill., 322.
In Elliott on Roads and Streets (2nd ed.), sec. 665, it is said:
“It has also been held that the injury must be irreparable, or at least incapable of full and complete compensation in damages. This is no doubt a fair statement of the general law, but the phrase 'irreparable injury’ is apt to mislead. It does 'not necessarily mean as used in the law of injunction, that the injury is beyond the possibility of compensation or damages, nor that it must be very great. * * * But if the nuisance is a continuing-one, invading substantial rights of the complainant in such a manner that he would thereby lose such rights entirely but for the assistance of a court of equity, he will be entitled to an injunction upon a proper showing, notwithstanding- the fact that he might recover some damages in an action at law.”
For further authorities on the legal significance' of the phrase “irreparable injury,” see Words & Phrases, vol. 4, p. 3772, where the subject is thoroughly covered.
For the reasons hereinabove pointed out, the *357 trial court committed error in dissolving the temporary injunction, and in dismissing plaintiff’s bill. The judgment, therefore, must be reversed and remanded, with instructions to the trial court to make the temporary writ of injunction permanent.
Decided May 13, A. D. 1912.
Rehearing denied July 8, A. D. 1912.
Reversed and remanded with directions.