No. 16,197.

BERMAN v. CITY AND COUNTY OF DENVER ET AL.
(209 P. [2d] 754)

Decided June 23, 1949. Rehearing denied August 29, 1949.

Mr. NORMAN E. BERMAN, pro se, Mrs. M. O. EDISON, for plaintiff in error. Mr. THOMAS H. GIBSON of counsel.

Messrs. HUGHES & DORSEY, Mr. ALLAN R. PHIPPS, Mr. D. B. ROBERTSON, Mr. THOMAS KEELY, for defendant in error Denver Tramway Corporation.

Mr. J. GLENN DONALDSON, Mr. MALCOLM LINDSEY, for defendant in error City and County of Denver.

*En Banc.*

MR. JUSTICE HAYS delivered the opinion of the court.

THIS is an action brought by Norman E. Berman as a taxpayer and resident of City and County of Denver and as a patron of The Denver Tramway Corporation, a Delaware corporation, on behalf of himself and others similarly situated, against City and County of Denver, a municipal corporation, and The Denver Tramway Corporation, to have ordinance No. 96, series of 1948, declared to be void and of no effect, and the enforcement of same enjoined.

Said ordinance is entitled, and in so far as pertinent, provides as follows:

"A bill for an ordinance concerning the Denver Tramway Corporation; granting to the Denver Tramway Corporation, its successors and assigns, authority for the elimination of rail lines on streets described herein; granting revocable licenses or permits for the operation of buses along and upon certain streets described herein; granting authority to operate trolley coaches or motor buses in lieu of rail lines on streets described herein; adjusting fares and providing for certain operating and regulatory matters.

"Be it Enacted by the Council of the City and County of Denver:

"Whereas, The Denver Tramway Corporation now maintains and operates a transit system composed in part of rail lines and trolley coach lines, operating under and by virtue of Ordinance No. 3 of 1885 and Ordinance

No. 36 of 1888 and composed in part of lines of gasoline buses operating under revocable permits, over, along and upon certain streets, alleys, viaducts, bridges, public ways and places in the City and County of Denver; and

"Whereas, due to the growth of the City of Denver, the convenience and necessity and the comfort of the inhabitants of the City of Denver require that certain portions of the transit system be changed and modernized to comply with the changed conditions, and to secure the public safety and convenience of the inhabitants of the City of Denver; and

"Whereas, The Denver Tramway Corporation has heretofore presented to the City Council certain ordinances with respect to the modernization and improvement of its system, and the City and the Company are desirous of completing the modernization of said system at as early a date as possible by converting the remaining rail lines to trolley coach or gasoline bus operation; and,

"Whereas, it is estimated that the program as outlined will require an expenditure of money in excess of six and one-half million dollars ($6,500,000.00), and in order that the company may attract the capital necessary to complete this program and to meet increased expenses, additional revenue in a substantial amount is needed immediately; and,

"Whereas, in order that a more flexible and workable arrangement may be had with respect to future relations between the City and the Company, it is the stated intention and desire of both:

"(1) That additions, extensions and improvements (other than those hereinafter specifically set forth) and various standards of service will be mutually agreed upon from time to time in order to provide adequate and convenient service to the people of Denver;

"(2) That as promptly as possible the City and the Company will co-operate in attempting to agree upon a just, legal and proper valuation of the properties of

The Denver Tramway Corporation, in order that a just and proper return may be realized through the operations of the Company; and

"(3) That in order to insure a more flexible and workable relationship between the City and the Company, a thorough investigation will be made of the service at cost principle, or some similar plan, in an endeavor to agree upon some such plan to the mutual advantage of the City, the people of Denver, and the Company.

"Now, Therefore, with full regard for and in consideration of the matters and things hereinabove set out, and with the intent and purposes of serving the convenience, necessity and safety of the inhabitants of the City and County of Denver:

"Be it Further Enacted by the Council of the City and County of Denver:

"Section 1. The Denver Tramway Corporation shall charge rates or fares which shall be fair and reasonable. After the effective date of this Ordinance, the Company shall not put into effect any rates or charges on its city lines, either rail or motor bus or trolley bus, in excess of the following:

"(a) Adults, and children over twelve (12) years of age, (other than school-children as defined in subsection (b) hereof): Ten (10) cents;

"(b) School-children under nineteen (19) years of age, when going to and from school and holding school cards: Five (5) cents;

"(c) Children six (6) years of age and over, and under twelve (12) years of age: Five (5) cents;

"(d) Children under six (6) years of age, when accompanied by a paying passenger: Free.

"Nothing herein contained shall constitute or imply an admission by the Tramway that the rates aforesaid are compensatory or non-confiscatory, but regardless of what the situation may be in respect to these matters, the rates or charges shall not be by the Tramway fixed

in excess of the maximum herein established. These rates or any others that may hereafter be established by the Tramway or the City, shall at all times be subject to regulation as provided by law.

"Section 2. The Denver Tramway Corporation is hereby authorized to operate trolley coaches or trackless trolleys as heretofore defined in Ordinance No. 51, Series of 1945, and to make such changes in equipment as may be required in connection therewith over, along, and upon the following streets, alleys, viaducts, bridges, public ways and places in the City and County of Denver in lieu of the operation of street cars with rails upon said lines as herein described:

[Detailed description of the following routes deleted.]

"(a) Route 8, University Park.

"(b) Route 61, Larimer Street.

"(c) Route 64, East 34th Avenue.

"(d) Route 3, Englewood.

"(e) Route 14, Colfax.

"(f) Route 5, Washington Park.

"Section 3. The Denver Tramway Corporation is hereby authorized to discontinue and the City hereby consents to the discontinuance of electric street car operation on the streets hereinafter in this section set out.

[Detailed description of the following routes deleted.]

"(a) Route 75, Barnum.

"(b) Route 72, Cherokee.

"(c) Route 61, Larimer. [Following the detailed description in this paragraph, we find]: (except that this route may be changed to a trolley coach as provided in section 2 above.)

"Section 4. The Denver Tramway Corporation, in accordance with the provisions of Ordinance No. 2 of 1930 and Ordinance 54 of 1934, is hereby granted a revocable license or permit for each of the following bus operations. Each operation shall be considered as independent of the other and the right to revoke said

permit or license as to one or more of the operations herein described under separate subdivisions of this section at any time by the City is expressly reserved.

[Detailed description of the following routes deleted.]

"(a) Route 75, Barnum.

"(b) Route 72, Cherokee.

"(c) Route 61, Larimer. [Following the detailed description in this paragraph, we find]: (Except that this route may be changed to a trolley coach as provided in section 2 above.)

"(d) Federal Boulevard.

"(e) Rerouting of Fort Logan Bus.

"(f) Rerouting of Alameda Bus.

"(g) 19th Avenue Bus.

"(h) Extension of 6th Avenue bus line.

"Section 5. It is understood and agreed between The Denver Tramway Corporation and the City, that the above sections, numbers 2, 3 and 4, constitute the immediate modernization program of the Company and that this program shall be immediately commenced; that the dates for completion of each of the additions, changes and new operations as herein listed will be as follows:

| | |
|---|---|
| "6th Avenue extension | 1948 |
| "19th Avenue bus | 1948 |
| "Fort Logan bus rerouting | 1948 |
| "Federal Boulevard bus | 1948 |
| "Rerouting of Alameda bus | 1949 |
| "Change of Route 72 line to motor bus | 1949 |
| "Change of Barnum line, Route 75 to motor bus | 1949 |
| "Conversion of Route 8 University Park line to Trolley coach | 1949 |
| "Conversion of Route 61, Larimer to Trolley Coach or motor bus | 1950 |
| "Conversion of Route 64, East 34th Ave. line to trolley coach | 1950 |
| "Conversion of Route 3, Englewood line to trolley coach | 1951 |
| "Conversion of Route 14, Colfax to trolley coach | 1951 |

"Conversion of Route 5, Washington Park line to
trolley coach ............................................................ 1951

"The company shall complete the additions, changes
and new operations by the respective dates herein set
out or by such dates as extended; provided, however, that
if for any cause beyond the control of the company, it be-
comes impossible for the company to make any comple-
tion within the time herein fixed for such completion,
then the Utilities Director of the City (or the person
then performing the duties now performed by the Utili-
ties Director) if he finds that such cause exists, shall
extend any completion date herein provided, with the
approval of the Mayor, for a period of not to exceed
twelve months; but if the application is for a longer
period then such application must be made to the City
Council and acted upon by ordinance.

"Section 6. The Utilities Director is hereby directed
to make a study of adequate standards of service and
to report to the Council and to the Mayor his suggested
standards at the earliest possible moment.

"Section 7. The Utilities Director is hereby directed
to make a study of the cost of service plan and to report
to the Council and to the Mayor thereon.

"Section 8. The Utilities Director is hereby directed
to order an appraisal made of the value of the prop-
erties of The Denver Tramway Corporation and to se-
lect, with the approval of the Council, the Agency to
make such valuation and to issue instructions to such
Agency as to the method and type of the appraisal.

"Section 9. Section 6 of Ordinance No. 2, Series of
1930, is hereby repealed.

"Section 10. In view of the fact that certain of the
provisions of this ordinance are contractual in their na-
ture, The Denver Tramway Corporation shall file with
the Clerk of the City and County of Denver its accept-
ance of the contractual provisions contained in this ordi-
nance within ten (10) days after the effective date of
this ordinance.

"Section 11. It is anticipated that extensions of, changes in, and construction of new trolley coach routes will from time to time be agreed upon by the City and the Company in order to better serve the inhabitants of the City and it is understood and agreed that the question of such extensions, changes and construction, whenever necessary, be submitted to a vote of the qualified taxpaying electors at a legal franchise election.

"Section 12. Neither this ordinance nor anything therein contained shall be construed or deemed or held to grant a franchise for the operation of either auto buses, trolley coaches, or rail lines. So far as concerns auto buses, their operation shall be in pursuance of this ordinance, and as hereinabove provided, be under revocable permits only and not otherwise. So far as concerns rail lines and trolley coaches, neither this ordinance nor anything therein contained, nor the passage, approval or acceptance thereof, shall be deemed or held to be, nor shall it constitute a waiver of, nor shall it in any manner or to any extent prejudice, impair or otherwise affect the claims or contentions or either or any part thereof, either of the City and County of Denver or of The Denver Tramway Corporation, or of the successors or assigns of them, or either of them in respect to the existence, duration and/or scope of any right or rights claimed by them or either of them with respect to the construction, maintenance and/or operation of any such rail lines and/or trolley coach lines in the streets and other public places of the City and County of Denver, or any successor thereof.

"Section 13. In the opinion of the Council, this ordinance is necessary for the immediate protection and preservation of the public health, convenience, safety and general welfare, and it is enacted for that purpose, and shall be in full force and effect immediately after the passage and final publication."

Defendants' motions to dismiss the complaint upon

the ground that the same failed to state a claim against them, or either of them, upon which relief could be granted, were sustained and the judgment of dismissal which followed, is before us for review on writ of error.

The errors upon which plaintiff relies for reversal of the judgment are in substance: That the trial court erred in holding and ruling that the council of City and County of Denver had jurisdiction and authority to pass the above ordinance; and, in particular, in holding that the council had the legislative power to regulate the charges for service by public utility corporations operating within City and County of Denver.

We shall hereafter refer to plaintiff in error as plaintiff; City and County of Denver as City; The Denver Tramway Corporation as Tramway; and the city council of City and County of Denver as council.

It is contended by plaintiff that the people of City and County of Denver have exclusive power to grant franchises to public utility corporations and to regulate the charges for service, and that no such power is vested in the muncipality known as City and County of Denver or in its legislative department, its council. On the other hand, defendants Tramway and City contend that the council had full power and authority to pass said ordinance and to regulate such rates.

Prior to December 1, 1902, the date when Article XX of the Constitution, pursuant to which City and County of Denver exists, became effective upon the proclamation of the then governor, power to license and regulate utility corporations and their rates was vested by the state legislative charters in the council of said city. S. L. '66, p. 95; S. L. '74, p. 264; S. L. '83, p. 60; S. L. '85, p. 82; S. L. '89, p. 127; and S. L. '93, p. 131.

Section 4 of article XX of the Constitution, provides inter alia:

"The people of the City and County of Denver are hereby vested with and they shall always have the

exclusive power in the making, altering, revising or amending of their charter * * *.

* * *

"No franchise relating to any street, alley or public place of the said city and county shall be granted except upon the vote of the qualified taxpaying electors, and the question of its being granted shall be submitted to such vote upon deposit with the treasurer of the expense (to be determined by said treasurer) of such submission by the applicant for said franchise. * * *"

Section 5 provides, inter alia: "The *citizens* of the City and County of Denver shall have the exclusive power to amend their charter or to adopt a new charter, or to adopt any measure as herein provided * * *." (Emphasis supplied)

Section 6 of said article, as amended November 5, 1912, provides in part: "The people of each city or town of this state, having a population of two thousand inhabitants as determined by the last preceding census taken under the authority of the United States, the State of Colorado, or said city or town, are hereby vested with, and they shall always have, power to make, amend, add to or replace the charter of said city or town, which shall be its organic law and extend to all of its local and municipal matters."

After article XX was adopted by the people of the State of Colorado in 1902, and prior to the adoption of the first people's charter in 1904, the council, in October, 1903, passed ordinance No. 87, granting to Colorado Eastern Railroad Company the right to occupy certain streets and alleys in City and County of Denver, either as a grant or as a mere permit or license. The validity of said ordinance was questioned in *Ward v. Colorado Eastern Railroad Co.*, 22 Colo. App. 332, 125 Pac. 567, wherein the Court of Appeals determined that after the effective date of said article XX, the power to regulate utilities and their rates was transferred from the city council to the qualified taxpaying electors of the new

municipality; that the pertinent provisions of article XX were self-executing; that the adoption of a charter was not required to give effect thereto; and in connection therewith said: .

"The prime purpose of the constitutional amendment was to bestow upon the inhabitants of the city of Denver, and certain surrounding territory, a very greatly increased measure of home rule, and the object of the provision now under consideration was to give the tax-paying electors of the aforesaid territory absolute control over the granting of franchises. It must be clear that the legislature in framing and submitting the amendment, and the people in adopting it, had these purposes in mind. Therefore, it cannot be assumed that either the legislature or the people deliberately incorporated in or omitted from the amendment provisions calculated to work powerfully against and greatly delay the adoption of the charter for which the amendment provided, and which was one of its important purposes.

\* \* \*

" 'We reach the conclusion, without hesitancy or misgiving, that immediately upon the taking effect of art. XX, the power to grant franchises like the one in question was thereby transferred from the city council to the qualified tax-paying electors of the new municipality. Hence it follows that the ordinance of 1903 was null and void, and 'upon authority we hold that the ordinance in the case at bar was void, and conferred no authority whatever upon the defendant, and cannot be invoked to give it protection.' *D. & S. Ry. Co. v. Denver City Ry. Co.*, 2 Colo. 683.' "

The opinion in the above case was affirmed by us in *Colorado Eastern R.R. Co. v. Ward*, 59 Colo. 589, 151 Pac. 1196.

In a later case, in dealing with the same subject matter, we said: "\* \* \* The purpose of the article was to enlarge the powers beyond those usually granted by the Legislature, and to bestow upon *the people of the munic-*

*ipality* 'every power possessed by the Legislature in the making of a charter for Denver.' *Denver v. Hallett,* 34 Colo. 393, 397, 83 Pac. 1066. And, subsequently, in *Londoner v. Denver,* 52 Colo. 15, 22, 23, 119 Pac. 156, referring to the *Denver-Hallett* case, we further declared: 'By that decision we determined that the powers enumerated in section 1 of article XX of the Constitution do not constitute a limitation of the powers conferred upon the municipality; and, moreover, the article conferred upon such *people (of the City and County of Denver)* every power possessed by the Legislature in making a charter for Denver.' " *City and County of Denver v. Mountain States Telephone & Telegraph Co.,* 67 Colo. 225, 184 Pac. 604. (Emphasis supplied)

 Pursuant to the authority vested in the people of City and County of Denver by said article XX, as hereinabove shown, there was adopted March 29, 1904, at a special city election called for such purpose, the first people's charter, which included section 268 (section 280 of the 1927 Compilation), which provides: "*All power* to regulate the charges for service by public utility corporations, is hereby *reserved* to the *people,* to be exercised by them in the manner herein provided for initiating an ordinance." (Emphasis supplied) Denver Municipal Code, 1927, p. 141, §280.

The construction to be given this section gives rise to the principal point in controversy herein. It is contended by plaintiff that under a proper interpretation of the section, the exclusive power to regulate rates in Denver is vested in the people of the City and County of Denver, while defendants contend that the City through its council has concurrent power with the people in respect to such regulation.

In support of defendants' contention it is argued with much vigor that the words "all power," as used in said section 280, does not mean "all power" but "is a very elastic word having many meanings," and "doubtlessly means 'full' or 'complete' power" and "was doubtlessly

inserted in section 280 as a warning to public utilities seeking franchises. It says to such public utilities that in the last analysis, the people retain the right to fix rates."

The above quotations were taken from the brief of the city attorney, but such argument has been approved and emphasized by counsel for Tramway in their brief. We are not prepared to place such a strained and un-- usual construction upon the word "all" as that given to it by defendants. We find that the word "all" appears approximately 400 times in the charter and approximately 33 times in article XX, and in each instance (except where its meaning is specially qualified as in section 209), in so far as we are able to determine, the word was given a very comprehensive meaning, was used in its popular and ordinary sense, and included everything and excluded nothing. The contention of counsel for defendants to the effect that the word "all" as used in section 280 does not mean "all," but merely a part, of the power to regulate charges for service by public utility corporations, is manifestly weakened by the fact that they also contend that the word "all" as used in section 18 of the Speer Amendment hereinafter set forth (section 209 of the 1927 charter), means "all" even though the phrase "all legislative powers" is limited therein by the word "possessed," and by the phrase "except as otherwise provided by this amendment."

We think there is no escape from the conclusion reached by the late Mr. Justice Denison in his concurring opinion in *City and County of Denver v. Mountain States Telephone & Telegraph Co., supra,* when he said: "I cannot agree with the proposition that the power to regulate rates is not expressly granted by such language. An express grant of *all power* is an express grant of *every power,* and the ratification of Charter Sec. 280 is an express grant." (Emphasis supplied)

The above conclusion that "all power" means "exclusive power" and "every power," is fortified by the

232

further fact that in the 1904 charter, provision was made in chapter IX thereof, for the city itself. to acquire, maintain, improve, and operate public utilities. Section 293 (formerly 263) expressly authorized the council "to fix the rates for service to be rendered in each public utility, work or way * * *." The failure of the charter convention to use any similar language in section 280 with respect to privately owned utilities operating under franchises seems conclusive that it was not the intention of the charter framers to grant the council any power relative to regulating charges for service by private utility companies.

█ It next is contended that if section 280 is construed as above, then and in that event "the Speer amendment repealed section 280 *as an exclusive grant of power,* and after the passage of the amendment in 1916, the power became concurrent." This contention presents the question as to whether or not there is an irreconcilable conflict between section 18 of the Speer Amendment (section 209 of the 1927 Compilation), and section 280, which was adopted as a part of the original charter in 1904. Section 18 of the Speer Amendment was originally section 4 of the 1904 charter, and provided inter alia: "All legislative powers conferred by the constitution upon the city and county except as otherwise provided, shall be vested exclusively in a council, consisting of a board of supervisors and a board of aldermen. * * *"

Later, a commission form of government was adopted and the above section amended February 14, 1913, to read: "All legislative powers *possessed* by the City and County, except as otherwise provided, shall be vested in a council of five commissioners, hereinafter designated as commissioner of property, commissioner of finance, commissioner of safety, commissioner of improvements, and commissioner of social welfare. * * *" (Emphasis supplied)

Said section 4 was again amended May 17, 1916, by

the so-called Speer Amendment, which created the mayor form of government, and was designated therein, as above indicated, as section 18 thereof, now section 209, and as amended, reads in part: "All legislative powers *possessed* by the City and County of Denver, conferred by article XX of the Constitution of the state of Colorado, or contained in the charter of the City and County of Denver, and otherwise existing by operation of law, *except as otherwise provided by this amendment,* shall be vested in a board of councilmen to consist of nine members." (Emphasis supplied)

It will be observed that in both the 1913 and 1916 amendments the word "possessed" follows the phrase "all legislative powers" thereby plainly indicating that some legislative powers were not "possessed" by the council. This interpretation of section 209 is in harmony with our construction of section 280 to the effect that the legislative power to regulate rates of utility corporations in Denver is one of those powers which the council does not possess. So construed, no repugnancy exists between the sections, both are given effect, and consequently, no part of section 280 is repealed by implication or otherwise.

The next argument advanced by the Tramway is that: "Moreover, under section 281 of the charter, the right to grant temporary permits is expressly recognized. It is submitted, that for that section to be effective by necessary implication temporary rights in relation to temporary permits must be authorized. The city so argues in its brief and we concur, and we think this court must also come to the same conclusion."

Section 281 to which the above contention relates, provides: "The council may grant a license or permit at any time, in or to any street, alley or public place, provided, such license or permit shall be revocable at any time, and such right to revoke shall be expressly reserved in every license or permit which may be granted hereunder."

A similar contention to that above set forth was made in *Ward v. Colorado Eastern R.R. Co., supra,* and the Court of Appeals, contrary to such contention, held: "It is contended on behalf of defendant that the ordinance of 1903, even if void as a franchise, nevertheless constitutes a valid permit or license which remained good as against plaintiff, and as against the city, until the same was revoked by the authority that attempted to make the grant, namely, the city. Under the law existing prior to the adoption of art. XX, this contention may have been sound, that is, the council, having under the previous law, authority to make the grant, a defective attempt by it to grant a franchise might operate as a license or permit. But the law with reference to grants of this character was so radically and fundamentally altered by the constitutional amendment as to make prior decisions on this point inapplicable. The council, being wholly without authority to grant a franchise in 1903, its abortive attempt so to do conferred no right whatever upon the defendant company. *D. & S. Ry. Co. v. Denver City Ry. Co., supra.* Especially is this true where the attempted grant was designed to confer a right on the company to construct the main line of its road over the streets of the city, the council being without power to make grants of this character, we are not called upon, under the facts disclosed by the record in this case, to consider and determine its power and authority to grant permits for local or limited incidental privileges such as that involved in the case of *McPhee & McGinnity v. U. P. Ry. Co.,* 158 Fed. 6, to which our attention has been directed."

Section 281, above mentioned, was before us for interpretation and construction in *Baker v. Denver Tramway Co.,* 72 Colo. 233, 210 Pac. 845, which concerned the validity of ordinance No. 74, series of 1921, purporting to authorize the Tramway to operate its street cars upon Downing Street, a street not mentioned in its franchise of May 15, 1906. Notwithstanding the fact that the

franchise under which it was then operating was adopted pursuant to the initiative provisions of the charter and voted upon by the people of the City and County of Denver, the Tramway insisted, as here, that the city council had authority, under the provisions of section 281 of the charter, to enlarge and extend its franchise privilege by the issuance of a temporary permit and revocable license for the operation of said street cars, upon the above named street. In rejecting such argument, we said:

"The right given by this ordinance was to lay a track in a street as a part of the main line, a right which is in no sense incident to the original franchise. If it be a franchise, it cannot be taken out of the constitutional inhibition by calling it a license. That the right to use the streets of the city for street railroads is a franchise is a matter not open to dispute. If, by a permit of this kind, the city council can grant the right to run cars on a street as a part of the main line, it can in effect enlarge the franchise, and wholly defeat the purpose of the people who placed the restrictions as to franchises in the Constitution.

\* \* \*

"We are of the opinion that the city council had no authority to grant to the defendant company the rights which the ordinance purports to give. To uphold such an ordinance is to approve a palpable attempt to evade a provision of article XX of the state Constitution, which reads as follows:

" 'No franchise relating to any street, alley or public place of the said city and county shall be granted except upon the vote of the qualified taxpaying electors.'

"If the charter provision for revocable permits authorizes the council to grant permits, which are in effect franchises, such provisions are invalid as in contravention of the Constitution. Just what such permits may cover, we are not now called upon to determine."

It next is contended by the Tramway, in which

the City joins, that: "Practical interpretation by the city in the past, of which the court may take judicial notice, eliminates any legal question of the power of the council to regulate fares and charges."

It is urged under the above heading that: "In many instances in the past twenty-five years the city council has regulated the charges by public utilities by ordinance without any initiated action by taxpaying electors. The present rates of the Telephone Company were fixed by the Council without initiated action by ordinance No. 140, passed in September, 1947. The 1930 ordinance fixing the fares for the Tramway, expressly repealed by the ordinance here questioned, was passed by the city council without initiated action."

Attention also is called to the passage by the city council of certain taxicab ordinances without initiated action.

From the above circumstances, said to exist, but not found in the record, defendant Tramway reaches the following conclusion, in which the City concurs: "The fact that many years ago some ordinances were adopted after initiated action, and that in the last twenty years all such ordinances have been adopted without initiated action, merely indicates that the city authorities have interpreted the charter provisions as permitting the enactment of such ordinances both by the council and through the initiative."

The obvious and conclusive answer to the above argument is that the people of City and County of Denver, in whom is vested the exclusive power to grant franchises and regulate rates, are not bound by abortive attempts of the council to do so. " 'Contemporary construction can never abrogate the text; it can never fritter away its obvious sense; it can never narrow down its true limitations; it can never enlarge its natural boundaries.' Story on Const., sec. 7." *People ex rel. Seeley v. May,* 9 Colo. 80, 10 Pac. 641; *People ex rel. v. Prevost,* 55 Colo. 199, 209, 134 Pac. 129; *Koenig,*

*County Treasurer v. Jewish Consumptives' Relief Society,* 98 Colo. 253, 255, 55 P. (2d) 325; *People ex rel. v. Hinderlider,* 98 Colo. 505, 507, 57 P. (2d) 894; *Montgomery v. City and County of Denver,* 102 Colo. 427, 436, 80 P. (2d) 434.

A further answer to such contention is that section 6 of article XX of the Constitution was amended November 5, 1912, and as amended it was declared, inter alia:

"It is the intention of this article to grant and confirm to the people of all municipalities coming within its provisions the full right of self-government in both local and municipal matters and the enumeration herein of certain powers shall not be construed to deny such cities and towns, and to the people thereof, any right or power essential or proper to the full exercise of such right.

\* \* \*

"All provisions of the charters of the City and County of Denver \* \* \* as heretofore certified to and filed with the Secretary of State \* \* \* which provisions are not in conflict with this article, \* \* \* *are hereby ratified, affirmed and validated as of their date.*" S. L. '13, p. 671. (Italics supplied)

One of the provisions of the original charter which was by the above amendment "ratified, affirmed and validated" was section 280, which reserved the exclusive power to regulate utility rates in the people of the City and County of Denver. Thereafter the general assembly adopted an act known as "Public Utilities Law," S. L. '13, p. 464, which provided among other things: "Section 14. The power and authority is hereby vested in The Public Utilities Commission of the State of Colorado, and it is hereby made its duty to adopt all necessary rates, charges, and regulations to govern and regulate all rates, charges and tariffs of every public utility of this State as herein defined. \* \* \*"

After the passage of said public utilities law controversy arose as to what agency had jurisdiction to

regulate utility rates in the City and County of Denver. It was contended on behalf of the Public Utilities Commission and the Mountain States Telephone and Telegraph Company that the commission had such jurisdiction, and City and County of Denver, for itself and on behalf of its citizens, contended that the people of City and County of Denver alone had such power. The controversy reached this court, and the question was decided January 14, 1919, in *City and County of Denver v. Mountain States Telephone & Telegraph Co., supra,* adverse to the contentions here made by defendants.

It was there held in substance: That by article XX every power theretofore possessed by the state legislature in the making of a charter for Denver was bestowed upon the people of the municipality; that said article created a new agency for regulating utilities operating within the city; that the power to regulate must be exercised "only to the extent and in the manner and form prescribed"; that the people of City and County of Denver were vested with exclusive power to make, alter, revise, or amend the charter, and in the exercise of which power adopted section 280 of the charter; that their right to do so was ratified, affirmed and validated by the adoption of the home rule amendment in 1912; and that section 280 of the charter "was in substantial effect written into the constitution."

The following excerpts from the opinion in the above case, are especially pertinent to the present inquiry.

"The granting of the right by the city to a public service corporation to use the streets of the municipality or the granting by the General Assembly to such a corporation the right to use the highways of the state, is the exertion of the proprietary power of the sovereign. The regulation, however, of the business of such public service corporation, whether performed by the Legislature or the municipality, is an exertion of the governmental power of the sovereign. Indeed, the governmental regulation of a business, whatever its character,

is always the exertion of the police power, and, therefore, law making. In the exercise of this power no agent can exhaust it and no vested right may be acquired therein. Such governmental power is inherent in the sovereign and may be exerted, withdrawn and re-exerted according to the judgment, whim or caprice of the sovereign. The ever-existing, inherent and inalienable power resides in the sovereign, to wit, the whole people of Colorado, to regulate the business of every public utility operating within the limitations of the state and to make and to remake, as changed conditions may require, a maximum schedule of rates to be charged for the service rendered by such utility."

\* \* \*

"However, were the law otherwise, the Constitution has *expressly* authorized the *people* of the municipality to regulate the charges for service by public utilities operating therein. Prior to the adoption in 1912 of the amendment to article XX of the Constitution, the City and County of Denver had attempted, at least, to exercise the power of regulating public utilities. Section 280, supra, of its charter had been enacted and such charter with that section therein was on file in the office of the Secretary of State. The constitutional amendment expressly approved, 'ratified, affirmed and validated' such charter and each and every provision thereof 'not in conflict with' Article XX. It further declared that such charter and the ordinances made pursuant . thereto in local and municipal matters shall supersede within the territorial limits of the municipality, any law of the state in conflict therewith. *This provision of the charter meaning section 280 was in substantial effect written into the Constitution.*" (Emphasis supplied)

The case, *Denver v. Telephone, etc. Co., supra,* was taken to the Supreme Court of the United States on writ of error and dismissed by that court in *Mountain States Telephone and Telegraph Co. v. Denver,* 251 U. S. 545, 40 Sup. Ct. 219, 64 L. Ed., 407. Such disposition

240

was in harmony with the decision of that court in *Home Telephone Co. v. Los Angeles,* 211 U. S. 265, 29 Sup. Ct. 50, 53 L. Ed., 176, upon which our decision in the telephone case was largely based.

The contention that any agency other than the people of the City and County of Denver, through the initiative, has authority to regulate rates or grant franchises in Denver, has never been legally supportable since the rendition of the opinion in the telephone case, supra, and this is not changed by the contemporaneous construction which the council may have from time to time placed upon the applicable provisions of the charter.

Section 280 of the charter not only reserves to the people of Denver the power to regulate rates, but prescribes the exact method by which such regulation shall be accomplished, to wit: "In the manner herein provided for initiating an ordinance." The section to which the above relates is section 273, which provides in part: "Section 22. Any proposed ordinance may be submitted to the council by petition therefor of qualified electors equal in number to at least five per cent. of the last preceding vote for mayor, and such proposed ordinance shall be passed without alteration by the council, * * * or the council shall refer such proposed ordinance to the qualified electors at the next municipal election held not less than sixty days after such petition is filed * * *."

The above method of exercising the legislative power to regulate charges of utility companies is exclusive; any attempt to regulate same by any other method is ultra vires, and void; " '* * * that where the mode in which their power on any given subject can be exercised is prescribed by their charter, the mode must be followed. The mode in such cases constitutes the measure of power.' " *Keese v. City of Denver,* 10 Colo. 112, 122, 15 Pac. 825; *Durango v. Pennington,* 8 Colo. 257, 7 Pac. 14; *Sullivan v. City of Leadville,* 11 Colo. 483, 18 Pac. 736; *Cordilla v. Pueblo,* 34 Colo. 293, 294, 82 Pac. 594; *Weaver*

*v. Canon Sewer Co.*, 18 Colo. App. 242, 245, 70 Pac. 953; *Sauer v. Town of Gillett, et al.*, 20 Colo. App. 365, 78 Pac. 1068; *State ex rel. v. Burr*, 79 Fla. 290, 84 So. 61; *City of Ft. Scott v. Eads etc. Co.*, 117 Fed. 51, 54, 54 C. C. A. 437.

The prescribed method "must be followed as it excludes all others by implication of law and a material departure therefrom is not a colorable compliance." *Willman v. Corsicana* (Tex. Civ. App.), 213 S.W. (2d) 155.

The aims, objects and purposes of the long and involved ordinance here considered, as stated by counsel for the Tramway in their brief and not denied by the City, is:

"That the passage of the ordinance was advisable to enable the City and the Tramway to agree with respect to future relations, and particularly upon the nature of the improvements to be made from time to time; upon the just, legal and proper valuation of the Tramway's properties in order that a just and proper return may be realized by it on its operations; and upon a more flexible working arrangement between the City and the Tramway in a mutual endeavor to agree upon *some plan of rate fixing* which would operate to the advantage of the city, the people and the Tramway.

"Upon these findings of the council, the provisions of the ordinance relating to the change in fare were adopted. Certain routes and reroutes of operation by trolley coaches and trackless trolleys in lieu of operations by rail were determined upon; a license was granted for the operation and rerouting of motor busses over other lines; and all of these were agreed to constitute the modernization program * * *." (Emphasis supplied)

The ordinance here considered makes provision for the Tramway to file its written acceptance of all contractual provisions in the ordinance within ten days from the date thereof. It is assumed that such was done

within the time and manner specified. It is not indicated what parts are, and what parts are not, considered contractual in their nature so as to require an acceptance thereof to make them binding.

With respect to the granting of franchises, the regulation of rates, and the extension and enlargement of franchise privileges under the authorities above cited, such enumerated powers can only be exercised through the initiative upon a vote of the qualified taxpaying electors as by charter provided, and cannot be made the subject of a contract between the City and Tramway. Such attempts "to agree upon some plan of rate fixing" cannot be permitted to supercede, abrogate, or cast aside mandatory provisions of the organic law of the City.

Nothing appearing in the record or the briefs to justify a departure from our former decisions, we conclude that the adopted ordinance here considered constitutes an attempt to grant, extend and enlarge franchise privileges and to regulate charges for service by the Tramway, a public utility corporation, operating within City and County of Denver, contrary to, and in violation of, article XX of the Constitution as amended, and the charter adopted pursuant thereto, and that the same is void and of no effect.

We find no merit in other questions advanced. The judgment of the trial court is reversed. Further proceedings, if any, shall be in harmony with the views herein expressed.

Mr. Justice Moore and Mr. Justice Holland dissent.

Mr. Justice Jackson and Mr. Justice Stone do not participate.

Mr. Justice Holland dissenting.

I am not in accord with the majority opinion herein which is contrary to my judgment, and the gravity of

the matter involved impels me to indulge an expression of disagreement.

It is my studied conclusion that the court in the majority opinion holds that the ordinance involved is, in effect, a franchise and as such can only be granted except upon vote of the qualified taxpaying electors; and that the opinion further holds that by section 280 of the charter of the City and County of Denver, the people have the exclusive power to regulate the charges for which provision is made in the offending ordinance.

It is not a franchise and I fail to understand how the section of the charter can be construed to mean exclusive power.

From a reading of article 18 of the charter, containing five sections numbered from 277 to 281, inclusive, dealing with franchises, it is unmistakable that the framers of the charter were mindful of necessary restrictions and prohibitions, and did not overlook placing certain restrictions and prohibitions by words, the meaning of which need no judicial interpretation. They were ready to, and did, say that no franchises, etc., shall be granted except upon the vote of the qualified taxpaying electors. They were equally positive in saying that franchises granted shall be limited to twenty years, and could have said, if they so intended, that the power to regulate charges for service by public utility corporations is exclusively reserved to the people. This they did not do, but did reserve—not exclusively—the right to fix or change the rates in the event the council, under its legislative authority, failed to do, or did, in a manner unsatisfactory to the people.

Nowhere in the books has it ever been said that the power to regulate utilities is not a legislative function, and it is not here contended that the power to fix charges is not a part of that function.

That power vested in the state legislature, and by the home-rule amendment to the Constitution, all such power as the state legislature had was alienated from

the state to the specified municipalities, as to matters of local and municipal concern and this court has long since determined that the regulation of the rates and charges of utility corporations was a matter of local and municipal concern. When that power passed to Denver, the people formulated and adopted their charter and vested all power possessed by the city, which was every power that had been conferred by amendment No. XX of the Constitution, in the board of councilmen. Nowhere in their charter have the people withheld this vested legislative function from the council. By section 280 of their charter, they retained not only equal, but a final, power in the matter of the regulation of the charges for service by public utilities. It is clearly disclosed that the people reserved the right to exercise this legislative function when, in their judgment, it was necessary and proper to do so, and it is further equally clear that such action, when taken by the people, is final so far as any other authority is concerned.

This power of the people is to be exercised in the manner provided for initiating an ordinance as set out in the charter. This is but a phase of the constitutional power of initiative and referendum. Can it be said because the people reserved to themselves the power to propose ordinances, that it strips the legislative body of the city of its right to do so? In principle and purpose, the initiative process is no different in home-rule municipalities, than in the state. Who would venture to say that the reservation in the constitutional provision for initiative and referendum deprives the legislature of its primary right to function?

Section 1, article V, of the State Constitution, in part, is as follows: "The legislative power of the state shall be vested in the general assembly consisting of a senate and house of representatives, both to be elected by the people, but the people *reserve* to themselves the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of

the general assembly, and also reserve power at their own option to approve or reject at the polls any act, item, section or part of any act of the general assembly." I do not dispute the statement in the majority opinion that the word "all" as used in section 280 of the charter, "included everything and excluded nothing." Of course, the people have every power to act, as prescribed, but it does not mean that the legislative body of the city is precluded. I may have all rights, powers and privileges to do certain things, reserved to me, but at the same time, others may have like privileges, unless the reservation is to me alone.

I challenge the use of the word "exclusive" wherever used in the opinion with reference to section 280. The word "reserve" as used in the section, is not a prohibitive word. It here means that the power referred to is kept in store for use, if thought to be needed.

The council being invested with full legislative power, we are not further concerned about its authority to pass the ordinance in question, but only to ascertain if it is prohibited. A study of the charter reveals no specific or direct prohibition. On the other hand, it does disclose section 281, which gives direct power to the council to grant a temporary or revocable license or permit, said section being: "The council may grant a license or permit at any time, in or to any street, alley, or public place, provided such license or permit shall be revocable at any time, and such right to revoke shall be expressly reserved in every license or permit which may be granted hereunder."

This is an express grant by the people. It would be glaringly absurd and irrational to grant such a license or permit without some regulation or limitation on the temporary use. The ordinance here, by its plain terms, is such a temporary measure, and in no sense a franchise. If, according to the majority opinion, the council has no power to pass such a temporary ordinance, then section 281 will forever pose as a dead letter.

The ordinance contemplates submission to the vote of the people. The temporary regulation of the rates involved in this ordinance is law-making, is a proper exercise of the police power, and in character, purely legislative. This legislative power is not forbidden to the city council.

It is now apparent that in my opinion the ordinance in question is a valid exercise of the power given the council by the people and in nowise prohibited by the charter. Concerning this, I entertain not the slightest doubt. However, the validity of the ordinance is doubted by counsel for plaintiff in error, and such doubts are ably expressed, and a like view entertained by some of my associates on this court. My views, inadequately expressed, are supported by able counsel for the City and the Tramway Company, as well as by the findings of the learned trial judge, and, I might add, by the United States Circuit Court of Appeals, when it said in *City and County of Denver v. Stenger,* 277 Fed. 865, in 1921, in discussing similar ordinances, "Subsequently the power to pass such ordinances was vested in the council of the City and County of Denver. * * * The Council of the City and County of Denver possessed the power to do what it said it was doing, * * *."

It is obvious that a doubt exists as to the validity of the ordinance, passed in due form, with all regularity. When so enacted it is clothed with the presumption of validity and not to be declared void. I quote from language used by Mr. Justice Shaw in *Wellington Petitioners,* 16 Pick. 95, and approved by us in *Alexander v. People ex rel.,* 7 Colo. 155, 2 Pac. 894: "The delicacy and importance of the subject may render it not improper to repeat what has been so often suggested by courts of justice, that when called upon to pronounce the invalidity of an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect, and ponder

upon it as long as deliberation and patient attention can throw any new light on the subject, and *never declare* a statute void unless the nullity and invalidity of the act are placed, in their judgment, *beyond a reasonable doubt."*

Finally, there can be no doubt that this court has on numerous occasions determined that the matter of regulating the charges by public utilities is a legislative function. By the Speer Amendment, which is now section 209 of the Denver charter, "All legislative powers possessed by the city * * * shall be vested in a board of councilmen * * *." The word "all" has identically the same meaning in this section of the charter as it has in section 280. If it could be thought that there is a conflict between these two sections on account of the use of the word "all," then the well known rule is to give effect to both sections. If fixing rates is a legislative function, the people have expressly granted that power to the council by the Speer Amendment, reserving, of course, the concurrent right in the people to do the same thing.

The council, having full legislative authority to enact the ordinance here in question, it is entirely valid, subject to the power of the people to change it if so desired. In that respect, the judgment of the trial court was right and should have been affirmed.

MR. JUSTICE MOORE dissenting.

Upon exhaustive study and thorough consideration of the petition for rehearing filed in this cause, I have concluded that the majority opinion, in which I originally concurred, is erroneous, and I respectfully dissent from the views therein expressed.

The case of the *City and County of Denver v. Mountain States Telephone and Telegraph Company,* 67 Colo. 225, 184 Pac. 604, is chiefly relied upon in the majority opinion as being decisive of this cause. The sole issue in that case, and the only question answered by this

court in that case was stated by Mr. Justice White as follows: "The sole question involved herein is whether the Public Utilities Commission has jurisdiction to regulate the rates to be charged by The Mountain States Telephone and Telegraph Company in its local service within the City and County of Denver." The question was answered in the negative. That power of regulation was held to belong to the home rule cities. No question was raised in that case which challenged the method by which a home rule city had attempted to use the regulatory power which the court held to be lodged in the home rule city. The sole question was whether the power was existent in the Public Utilities Commission.

In the instant case, the question is entirely different. The home rule city of Denver has, by ordinance of the legislative body of the city, attempted an exercise of this regulatory power. The legality of this ordinance is the issue here.

Numerous opinions of this court hold that the validity of an ordinance of a home rule city is determined by the test of inquiring whether the ordinance relates to matters of "municipal or local concern." We have held that the regulation of public utilities operating within a municipality is a matter of "municipal or local concern."

Regulation of utilities calls for an exercise of the police power, but any attempted exercise thereof must meet all tests of applicable constitutional provisions which protect against a deprivation of property without due process of law.

By section 18 of the so-called Speer Amendment which is now in effect (section 209, Municipal Code, 1927), it is provided that: "All legislative powers possessed by the city and county of Denver, conferred by Article XX of the constitution of the state of Colorado, or contained in the charter of the city and county of Denver, and otherwise existing by operation of law, *except as otherwise provided by this amendment,* shall be

vested in a board of councilmen to consist of nine members * * *." Regulation of utilities is universally held to be a legislative function. It follows, therefore, that the city council has plenary, full and complete power to legislate for the city in any matter of local or municipal concern, unless there is a valid limitation placed thereon. We look to see whether the exercise of a particular power by the council of the city is prohibited. If not prohibited, the power exists in the council in all matters of local or municipal concern.

The majority opinion holds, in effect, that the limitation upon the power of the council, which invalidates the ordinance in question, is to be found in the charter provision which appears as section 280, Municipal Code 1927. I consider this section to be void as violative of the due process clause of the Constitution of the United States. Unquestionably, if said section 280 had been omitted from the charter, the council would have the power to act in the manner here questioned, because, as above pointed out, the council is expressly given all legislative power, "except as otherwise provided by this amendment." By the terms of section 280, the regulatory power attempted to be reserved to the people can only be exercised by them in the particular manner therein provided for. The difficulty, as I see it, arises from the manner in which the exercise of the power sought to be reserved, is to be exercised by the people. If, as here, the power reserved to the people can only be exercised by them in a manner which amounts to a palpable violation of due process of law, then the claimed limitation upon the otherwise plenary power of the council is void. This court should zealously protect the right of the people to initiate laws and refrain from needlessly placing unreasonable restrictions upon the free exercise of that right. But it is equally important that this court should not deny a corporate entity a fundamental constitutional right to due process of law upon the ground that the denial thereof is being

accomplished by an ordinance initiated by the people. A failure to provide due process of law is no less offensive because it stems from an initiated ordinance.

Wherein does section 280 violate the guarantee of due process of law? It provides, in substance, that the people shall exercise the power to regulate the rates to be charged by public utility companies "in the manner herein provided for initiating an ordiance." The procedure for rate regulation, thus fixed upon, makes no provision whatever for a hearing of any kind at which the public utility to be regulated is afforded an opportunity to make a showing, or present facts essential to a fair determination of what the rate should be. The rate is fixed, the regulation is determined in the ex parte deliberation of the sponsors of the initiated measure, who presumably are the representatives of the people who sign the petitions. Upon submission of the duly signed petitions to the named authority, the city council must either forthwith adopt the measure without amendment, or refer it to a vote of the people. If adopted, either by vote of the council, or by the people upon the referendum election, the rate which the corporation is permitted to charge as fixed by the measure thus adopted, and all other regulations therein contained, are given the effect of law. At no point in the entire process is any hearing provided the corporation.

If there is any one firmly established concept of "due process of law," it is that no person or corporation can have their rights adjudicated, or otherwise determined without full opportunity to said person or corporation to be heard. Any proceeding, the purpose of which is the fixing of a price to be charged for a commodity or service, is a proceeding which most certainly involves a property right of the person or corporation supplying the commodity or service. Such person or corporation is protected by the due process clause against any attempt to force upon him a price in the fixing of which he has

been wholly excluded, and concerning which he is provided no hearing as a matter of absolute right.

It is no answer to the foregoing to assert that if the people should fix a rate that is confiscatory, the utility has the right to go into court, in a new proceeding, and enjoin the enforcement of the rate. To so hold would be to destroy the practical effectiveness of constitutional protection. The Constitution was not intended for use as a key with which to "lock the barn after the horse is stolen," nor as a lantern with which to seek, in dark places, a restoration of lost property. If the fundamental guarantees of the Constitution are to have practical meaning, they should be given effect to prevent the injury at its inception.

Applying this reasoning to the case at bar, it is most apparent that the only provision which tends to invalidate the ordinance in question is section 280 of the charter. Upon its face, this section fails to provide even the semblance of due process of law. For that reason it is void. A void provision in a city charter creates no limitation on the power of the legislative body of the city.

It is not my purpose unduly to lengthen this dissent with quotations from the decided cases. As justification for my position, however, I direct attention to *Graham v. Dye,* 308 Ill. 283, 139 N.E. 390, where I find the following: "It was said in *Hills v. City of Chicago,* 60 Ill. 86, if courts set the pernicious example of frittering away, by construction, the plain prohibitions of the constitution, even though the prohibition may not seemingly be of the greatest importance, the constitution would be of little value, for if one provision may be evaded or abrogated there is no security that others may not be."

Even stronger language was used by this court in *Walker v. Bedford,* 93 Colo. 400, 26 P. (2d) 1051. I quote from the opinion in that case, the following: "We pronounce as the most certain of law that there has never been, and can never be, an emergency confronting the state that will warrant the servants of the Con-

stitution waiving so much as a word of its provisions. Armed men may destroy the government. Military rule, or the rule of the mob, may replace the orderly processes that have been our fortune since sovereignty was granted us by the United States. But no species of reasoning, no ingenuity of construction, no degree of emergency, can persuade us that the Constitution is without potency or dissuade us from performing our duty as its sworn officers."

While the issue in each of the above cited cases did not involve a question of regulation of public utilities, the necessity for invoking the protection of constitutional guarantees was no more apparent there than attend the case at bar.

The rule which I believe should control disposition of this cause is stated in 12 American Jurisprudence, page 373, section 698: "A public utility must be afforded some opportunity to be heard as to the reasonableness of the rates fixed for its charges by a rate-fixing commission. The right to a fair and open hearing is one of the rudiments of fair play assured to every litigant by the Federal Constitution as a minimal requirement. There must be due notice and an opportunity to be heard, the procedure must be consistent with the essentials of a fair trial, and the commission must act upon evidence and not arbitrarily. Such procedure is an inexorable safeguard. Moreover, there can be no compromise on the footing of convenience or expediency or because of a natural desire to be rid of harassing delay when such minimum requirements are ignored. Hence, if no hearing is provided for, and no notice or summons to the company required before the commission has found what it is to find, and no opportunity is provided for the company to introduce witnesses before the commission, not even the semblance of due process of law is provided. * * *"

While the above quotation and the authorities cited to support the text deal with the rate fixing power of commissions, the same principle is applicable to any rate fixing authority, and "the people" in the exercise of a rate fixing power cannot act to deny due process more readily than any other rate fixing authority.

I concur in the dissent of Mr. Justice Holland, and I am authorized to state that he concurs in the views hereinabove expressed.