ABERDEEN CABLE TV SERVICE, INC., Respondents

v.

CITY OF ABERDEEN et al., Defendants and Respondents

and

SOUTH DAKOTA TELEVISION, INC., Intervenor, Defendant and Appellant

(176 N.W.2d 738)

(File No. 10731. Opinion filed May 5, 1970)

Petition for rehearing denied June 30, 1970

**Voas, Richardson, Groseclose & Kornmann,** Aberdeen, for intervenor-defendant and appellant.

**Austin, Hinderaker & Hackett,** Watertown, for plaintiffs and respondents.

**F. W. Noll,** Aberdeen for defendants and respondents.

HANSON, Judge.

On August 12, 1968 the Aberdeen City Commission enacted Ordinance No. 1187 - Amended entitled:

> "An ordinance granting to Aberdeen Cable TV Service, Inc. the non-exclusive right to erect, maintain and operate in, under, over, along, across, and upon the present and future streets, lanes, avenues, sidewalks, alleys, bridges, highways and other public places in the City of Aberdeen, South Dakota and subsequent additions thereto, towers, poles, lines, cables, wires, other apparatus and additions thereto, for the purpose of transmission and distribution by cables and/or wires of television signals to enable sale of community television antenna service to the inhabitants of said City and other purposes, for a period of twenty (20) years, regulating the same, and providing for compensation to the City."

The Ordinance was referred to the electors of the City and substantially defeated at the election. The referendum petitions were determined by the trial court to be insufficient and the election void. Nevertheless, the court concluded Aberdeen Cable TV Service, Inc. was not a public utility and Ordinance No. 1187-Amended was in full force and effect as it did not grant a franchise and did not have to be submitted to a vote of the electors. Therefore, the sole issue on appeal is whether the Ordinance required submission to a vote of the electors before it could become effective.

Community antenna television is a relatively new means of television transmission. It is described and explained in a symposium on "Communications" in Vol. 34, No. 2, Law and Contemp. Prob. on p. 238 as follows:

"Cable television, alias community antenna television (CATV), began for the purpose of serving people in communities which did not receive over-the-air television and has become the potential complete telecommunications system. By linking space satelites, radio, television, facsimile, telephone, teletype, telemetry, computers, data storage and retrieval systems, and other communications hardware in a complete cable-to-home communications system, it is possible to place each person in contact with his full information environment and to allow each person to contribute information to the storehouse of knowledge.

"Cable television had its inception in 1949. By mid-1968, approximately 2,000 cable television systems were operating or under construction. These systems were capable of carrying their own programs, in addition to signals received from regular television stations. Initially, cable television served communities lacking television service or receiving a signal of poor quality. An antenna was placed on a mountain or tall tower, and the signal was picked up, amplified, and transmitted via cable to the viewer's home. Later, microwave relay also was used to bring the signal from the point of origination

or capture to the distribution point in the community served. At the distribution center, connection is made with coaxial cable or other wire-distribution lines. Usually, the distribution cable is supported by telephone or electric utility poles, the cable television system paying a rental for the use of the poles. In some cases, the cable is laid beneath city streets, an easement being obtained from the city; in other cases it may be necessary for the cable television system to erect poles for the cable. The signals are amplified at the central distribution point, and, depending upon the length of the cable and other conditions, further amplification of the signal may be necessary along the line. The systems now being installed usually are twelve-channel systems. However, twenty-channel systems are technically feasible at slightly greater cost, and some such systems have been installed. The multiple purpose cable can carry simultaneously as many signals as there are channels, using different frequencies.

"At home, the cable is attached directly to the television receiver. The viewer, as with the selection of conventional over-the-air broadcasting channels, turns the dial to select the channel carrying the program desired. More than three and a half million homes in the United States are receiving cable television service."

In this state an abutting property owner in a municipality holds fee title to the center of the street, SDCL 43-16-3, subject and subordinate to an easement or servitude in favor of the public. "When a street is used for any proper street purpose by permission of the city authorities, such use does not constitute an additional servitude, though such use may not have been known when the streets were dedicated, appropriated, or condemned for street purposes, and the abutting fee owner is not entitled to compensation for any damages he may sustain by reason of such use." Kirby v. Citizen's Telephone Co., 17 S.D. 362, 97 N.W. 3. But an unauthorized use of the streets for private purposes is compens-

able. 39 Am.Jur.2d, Highways, Streets, and Bridges, § 160, p. 535. In this respect every municipality in this state is expressly authorized

> "* * * to regulate or prohibit the erection of poles for telegraph, telephone, or electric wires in the public grounds, streets, or alleys, and the placing of wire thereon, and to require the removal thereof from such places and to require the placing of such wires under ground; and to grant and regulate rights and franchises for such purposes." SDCL 9-35-1.

> "The governing body shall grant no franchise to any public utility authorizing it to occupy any of the streets, alleys, or public places of the municipality without submitting the proposition of issuing such franchise to a vote of the electors thereof at a general or special election called for the purpose." SDCL 9-35-3.

In State v. Scougal, 3 S.D. 55, 51 N.W. 858, the court pointed out the term "franchise" means a special privilege conferred by government upon an individual which does not belong to citizens generally by common right. Accordingly, the ordinance granting Aberdeen Cable TV Service, Inc. the right to erect, maintain and operate towers, poles, lines, cables, wires, and other apparatus in, under, over, along, across and upon all the streets, sidewalks, alleys, bridges, and highways in the City of Aberdeen for the transmission and distribution of audio, visual, electronic and electric signals for a period of twenty years is clearly a franchise ordinance as it confers upon a private corporation for profit a right or privilege which does not belong to the citizens of Aberdeen generally by common right. Kornegay v. City of Raleigh, 269 N.C. 155, 152 S.E.2d 186; 36 Am.Jur.2d, Franchises, § 1, p. 723.

The public utility commission is given general supervision of all common carriers in the state, except street railways, SDCL 49-3-4, and for this purpose the term "common carriers" shall be deemed and taken to mean "all corpor-

ations, companies, or individuals now owning or operating, or which may hereafter own or operate any railroad, express company, telegraph, or telephone company, in whole or in part, in this state." SDCL 49-3-1. These provisions merely designate the public utilities which are now subject to regulation by the commission. Obviously, all public utilities in this state are not under the control and supervision of the public utilities commission, such as water, gas, and electric companies. Furthermore, all common carriers are public utilities, but all public utilities are not common carriers.

■■■ The question of whether or not a given business, industry or service is a public utility "does not depend on legislative definition, but on the nature of the business or service rendered, and an attempt to declare a company or enterprise to be a public utility, where it is inherently not such, is by virtue of the guaranties of the federal Constitution, void wherever it interferes with private rights of property or contract. So, a legislature cannot by mere fiat or regulatory order convert a private business or enterprise into a public utility, and the question whether or not a particular company or service is a public utility is a judicial one". 73 C.J.S. Public Utilities § 2, p. 993. The term "public utility" is defined in Black's Law Dictionary 4th Ed. as follows:

> "PUBLIC UTILITY. A business or service which is engaged in regularly supplying the public with some commodity or service which is of public consequence and need, such as electricity, gas, water, transportation, or telephone or telegraph service. Gulf States Utilities Co. v. State, Tex.Civ.App., 46 S.W.2d 1018, 1021. Any agency, instrumentality, business industry or service which is used or conducted in such manner as to affect the community at large, that is which is not limited or restricted to any particular class of the community. State Public Utilities Commission v. Monarch Refrigerating Co., 267 Ill. 528, 108 N.E. 716, Ann.Cas. 1916A, 528. The test for determining if a concern is a public utility is whether it has held itself out as ready, able and willing to serve the public. Humbird

Lumber Co. v. Public Utilities Commission, 39 Idaho 505, 228 P. 271. The term implies a public use of an article, product, or service, carrying with it the duty of the producer or manufacturer, or one attempting to furnish the service, to serve the public and treat all persons alike, without discrimination. Highland Dairy Farms Co. v. Helvetia Milk Condensing Co., 308 Ill. 294, 139 N.E. 418, 420. It is synonymous with 'public use,' and refers to persons or corporations charged with the duty to supply the public with the use of property or facilities owned or furnished by them. Buder v. First Nat. Bank in St. Louis, 8 Cir., 16 F.2d 990, 992. To constitute . a true 'public utility,' the devotion to public use must be of such character that the public generally, or that part of it which has been served and which has accepted the service, has the legal right to demand that that service shall be conducted, so long as it is continued, with reasonable efficiency under reasonable charges. Richardson v. Railroad Commission of State of California, 191 Cal. 716, 218 P. 418, 420. The devotion to public use must be of such character that the product and service is available to the public generally and indiscriminately, or there must be the acceptance by the utility of public franchises or calling to its aid the police power of the state. Southern Ohio Power Co. v. Public Utilities Commission of Ohio, 110 Ohio St. 246, 143 N.E. 700, 701, 34 A.L.R. 171."

■ It is now settled that community antenna television is subject to governmental regulation and control in the public interest. The Federal Communications Commission asserted jurisdiction over both cable and microwave CATV by issuing regulations governing the carriage of local television signals, signal duplication, and prohibited cable systems, temporarily, from entering the 100 largest television markets of the nation. The Commission's power and authority to regulate all CATV systems was affirmed in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001. Also the state of Nevada imposed statewide

public utility regulation over its cable television systems and its constitutionality was upheld by a three-judge federal court in TV Pix, Inc. v. Taylor D.C., 304 F.Supp. 459. Therefore, it would now appear to be merely a matter of how extensive national, state, and local supervision will eventually be asserted and exercised over cable television programs, service, and rates. For our present purposes it is sufficient that the nature and character of CATV renders it subject to governmental control in the public interest.

■ We conclude that within the purview of SDCL 9-35-1 and 9-35-3 Aberdeen Cable TV Service is a public utility. Consequently, franchise Ordinance 1187-Amended not having been submitted to and approved by the electors of Aberdeen, as required by law, is of no force and effect.

Reversed.

RENTTO, BIEGELMEIER and HOMEYER, JJ., concur.

ROBERTS, P. J., not participating.