COMMUNITY TELE–COMMUNICA-TIONS, INC., a Nevada corporation, and the City of Cortez, Colorado, a Colorado municipal corporation, Petitioners,

v.

The HEATHER CORPORATION, a Colorado corporation, and Wayne Gangwish, Respondents.

No. 81SC371.

Supreme Court of Colorado, En Banc.

Feb. 21, 1984.

---

Sherman & Howard, Stephen M. Brett, Robert E. Youle, David Swinton, Denver, for petitioners.

Friedman, Hill & Robbins, Robert F. Hill, Karen A. Tomb, Denver, for respondents.

ROVIRA, Justice.

We granted certiorari to review the decision of the court of appeals in *Heather Corp. v. Community Tele-Communications, Inc.*, 642 P.2d 24 (Colo.App.1981), holding that a city of Cortez ordinance, which granted a cable television company a permit to use the streets and public ways to install a cable television system, was invalid because it granted a franchise without a vote of the electorate. We affirm.

I.

In September 1979, the city council of Cortez, a Colorado home rule city, enacted Ordinance No. 532, entitled "An Ordinance Granting a Permit to Community Telecommunications, Inc., Its Successors and Assigns, to Construct, Operate and Maintain a Cable Television System in the City of Cortez ...." Section 2 of the ordinance outlines the specific grant of authority to Community Tele-Communications (CTI):

"There is hereby granted by the City to [CTI] the right and privilege to engage in the business of operating and providing a CATV [cable television] system in the City, and for that purpose to erect, install, construct, repair, replace, reconstruct, maintain and retain in, on, over, under, upon, across and along any public street now laid out or dedicated and all extensions thereof and additions thereto in the permit area, such poles, wires, cable, conductors, ducts, conduit, vaults, manholes, pedestals, amplifiers, appliances, attachments, and other property as may be necessary and appurtenant to the CATV system; and in addition so to use, operate, and provide similar facilities or properties rented or leased from other persons, including but not limited to any public utility or other grantee franchised or permitted to do business in the City."

In essence, this grant authorizes CTI to "use and occupy" the streets and other public ways in Cortez for the purpose of laying its coaxial cable and constructing and operating a cable television system.

Other sections of the ordinance explain the terms and conditions of CTI's "permit." Section 3 provides that the grant to CTI is not exclusive, that the city reserves the right to grant a similar use to any other person, and that the ordinance creates a permit and not a franchise in CTI. Section 4 provides that the term of the permit is for ten years and that, upon application by CTI, "the permit may be renewed for subsequent ten ... year periods" provided CTI faithfully performs all of the conditions of the permit. Section 15 provides that if CTI fails to perform, the city "may, after hearing, determine such substantial failure," at which point CTI has three months "to remedy the conditions" or the permit will be forfeited. Finally, section 22 provides that "it shall be unlawful for any person to construct, install or maintain" along the streets of Cortez "any equipment or facilities for distributing any television signals ... through a CATV system, unless a permit authorizing such use ... has first been obtained" from the city.

After Ordinance 532 was passed, respondent Heather Corporation (Heather) filed a complaint [1] against CTI and the city of Cortez pursuant to section 13–51–106, C.R.S.1973, the Uniform Declaratory Judgments Law. The complaint sought an order from the Montezuma County District Court declaring the ordinance to be unlawful and permanently enjoining the defendants from proceeding under it. Heather claimed that, instead of granting a true permit to CTI, Ordinance 532 actually granted a cable television "franchise." According to article X, section 1 of the Cortez City Charter, however, "[n]o franchise shall be granted except upon the vote of the taxpaying electors." Since Ordinance 532 was enacted by the city council rather than by popular vote, Heather argued that it violated the city charter and was void.

CTI and Cortez moved to dismiss the complaint for failure to state a claim upon which relief can be granted, see C.R.C.P. 12(b)(5), and Heather responded with a motion for summary judgment. See C.R.C.P. 56(a). The parties then requested the district court to decide the issues as if each party had filed a motion for summary judgment. In September 1980, the court entered a judgment declaring Ordinance No. 532 to be unlawful and in violation of article X, section 1 of the Cortez City Charter and article XX of the Colorado Constitution.[2] As a basis for its decision, the court adopted the following conclusions of law:

1. The complaint alleged that the Heather Corporation was a Colorado corporation formed for the "express purpose" of providing cable television service to Cortez and surrounding communities. Subsequent to the filing of the initial complaint, two amended complaints were filed without objection. In the second amended complaint, Wayne Gangwish was added as a plaintiff, and it was alleged that he was a "citizen and taxpayer of the City of Cortez."

2. Section 4 of article XX states in part:
"No franchise relating to any street, alley or public place of the ... city and county [of Denver] shall be granted except upon the vote of the qualified taxpaying electors, and the question of its being granted shall be sub-

"C.  'Franchise' is not limited to a special right granted to a public utility.

D.  Consent of a municipality to use its streets, alleys and public places has been recognized as a franchise.

E.  A franchise need not be exclusive.

F.  The right to operate a Cable TV service in a city is a subject for a franchise.

G.  Ordinances substantially similar to Ordinance 532 are usually determined to be grants of a franchise ...."

The court concluded that "Ordinance 532 does not grant a temporary permit but is rather an attempt *to evade the provisions* of the Charter by calling the grant a permit when in reality it has all the earmarks of a franchise." (emphasis in original).  It then enjoined CTI and Cortez from proceeding under the ordinance to establish a cable television system without the approval of the taxpaying electors of Cortez.

A divided panel of the Colorado Court of Appeals affirmed the judgment of the district court.  *Heather Corp.*, 642 P.2d 24 (Colo.App.1981) (Tursi, J., dissenting).  The court determined that Ordinance 532 grants a special right or privilege which does not ordinarily belong to citizens in general and that the privilege is absolutely essential to the performance of CTI's purpose.  It agreed with the district court that the privilege granted by the ordinance is in fact a franchise rather than a license or permit.  As such, the ordinance amounts to "an unlawful avoidance of the public election requirement" of article X, section 1 of the city charter.[3]

### II.

Although the majority opinion of the court of appeals did not address the issue of whether Heather has standing to bring an action against CTI and Cortez challenging the validity of Ordinance 532, we think it necessary to resolve this issue.  Applying the test we established in *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977), we conclude that Heather has standing under the Uniform Declaratory Judgments Law, section 13–51–101 *et seq.*, C.R. S.1973.  In view of our resolution of the standing issue as to Heather, we need not consider whether the other respondent, Wayne Gangwish,[4] also has standing.

Heather claims that it was "formed for the express purpose of constructing a cable television system and providing cable television service to Cortez, Colorado, and surrounding areas."  It claims that it has notified city officials of its desire to apply for a franchise to install and operate a cable television system, but that Cortez "has not offered Heather the opportunity to apply for a franchise."  Instead, the city has adhered to its position that it can grant a permit to one or more cable television companies and thereby avoid a franchise election.  Consequently, Heather argues,

"[u]ntil the question of what constitutes the proper authority is resolved, Heather is precluded from engaging in the business it was organized to pursue.  It is unreasonable for Heather to make the commitment of time and expense that is necessary to provide a high quality cable

mitted to such vote upon deposit with the treasurer of the expense ... of such submission by the applicant for said franchise." Section 4 is applicable to all Colorado home rule cities, including Cortez.  *See Colo. Const.* art. XX, sec. 6.

3.  Judge Tursi, in his dissent, disagreed with the franchise-permit analysis of the majority.  In addition, he was of the opinion that the complaint should have been dismissed because "[a] party whose only injury or damage will result from lawful competition from a permittee suffers no legal wrong and has no legal standing to bring an action challenging the permit granted under a municipal ordinance."

4.  *See supra* note 1.  Gangwish alleges that he is a citizen and taxpayer of Cortez who is adversely affected by the city's action taken in violation of Article X of the charter.  In addition, he argues that the unlawful use of the streets will adversely affect him because public funds will have to be expended for repair and restoration of the streets.  While we do not address the issue here, we note that the court of appeals recently discussed taxpayer standing in *People ex rel. Feld v. City and County of Denver*, 673 P.2d 43 (Colo.App.1983) (*cert. denied* November 15, 1983).

television system to Cortez when there is uncertainty as to the propriety of the only operating authority Cortez will presently grant and to the legality of Ordinance No. 532." [5]

This uncertainty, according to Heather, creates "a triple dilemma." Heather must either apply for a permit which it considers to be in violation of the charter, commit a criminal offense by proceeding to install and operate a cable television system without a permit, or discontinue the business it was organized to pursue. Under the circumstances, Heather maintains, the method chosen to resolve its dilemma, namely the filing of a declaratory judgment action, was appropriate. We agree.

Section 13–51–106 of the Uniform Declaratory Judgments Law describes who may obtain a declaratory judgment. It states: "Any person ... whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." [6] The purpose of this statute is to afford relief from the uncertainty surrounding legal rights and legal relations; it is remedial in nature and should be liberally construed and administered. *Colorado State Board of Optometric Examiners v. Dixon*, 165 Colo. 488, 440 P.2d 287 (1968); *Silverstein v. Sisters of Charity*, 38 Colo.App. 286, 559 P.2d 716 (1976); section 13–51–102, C.R.S.1973; C.R.C.P. 57(k).

We recognize that a declaratory judgment action must be based on an actual controversy. *Beacom v. Board of County Commissioners*, 657 P.2d 440 (Colo.1983); *Farmers Elevator Co. v. First National Bank*, 176 Colo. 168, 489 P.2d 318 (1971). To have standing, Heather must establish that its rights are adversely affected by Ordinance 532. This requirement does not mean, however, that Heather must risk the imposition of fines or imprisonment or the loss of property or profession in order to secure the adjudication of uncertain legal rights. *See CF & I Steel Corp. v. Colorado Air Pollution Control Commission*, 199 Colo. 270, 610 P.2d 85 (1980); *Johnson v. District Court*, 195 Colo. 169, 576 P.2d 167 (1978); *Colorado State Bd. of Optometric Examiners v. Dixon*, 165 Colo. 488, 440 P.2d 287 (1968).

In *Dixon*, several optometrists challenged the legality of a board regulation which had not yet been applied to them. We determined that the plaintiffs had standing, since, in our view, they should not be required to violate the challenged regulation in order to obtain a declaration of its validity or invalidity. Similarly, in *Johnson*, an oil-well servicing company challenged the legality of a local zoning regulation which required the company to obtain numerous permits. The plaintiff argued that it faced the choice of submitting to an "illegal" permit procedure or discontinuing its operations. We reaffirmed the *Dixon* principle and held that "the threat of an immediate and irreparable loss" to the company justified the issuance of a preliminary injunction to preserve the status quo pending final determination of the merits of the declaratory judgment action. We find the reasoning in *Dixon* and *Johnson* persuasive in this case.

Ultimately, though, the issue of Heather's standing must be analyzed under the two-pronged test adopted by this court in *Wimberly v. Ettenberg*, 194 Colo. 163, 570 P.2d 535 (1977). To resolve questions of standing, we must determine (1) whether the plaintiff has suffered injury in fact, and (2) whether the interest advanced by the plaintiff is legally protected by law. In the context of a declaratory judgment action,

---

5. Heather also contends that as a result of the city's illegal authorization of the permit, CTI has gained an unfair economic advantage over it with respect to providing cable television service to Cortez residents.

6. C.R.C.P. 57(b) contains the same language as section 13–51–106.

the first prong indicates whether the party has been "adversely affected"; the second prong establishes the existence of a right. Furthermore, "a decision on the merits is always inextricably tied to every case which involves the issue of standing. When standing is in issue, the broad question is whether the plaintiff has stated a claim for relief which should be entertained in the context of a trial on the merits." *Id.* at 168, 570 P.2d at 539.

Applying the *Wimberly* test to Heather's second amended complaint, we conclude that Heather has stated a claim for relief and that it was appropriate for the district court to consider Heather's claim on its merits. In our opinion, Heather has demonstrated that it is affected, or injured, by Ordinance 532. First, the complaint alleged that Ordinance 532 and the permit procedure incorporated in the ordinance are unlawful. In Heather's view, they reflect an attempt by the city council to accomplish the long-term installation of coaxial cable on the streets of Cortez by means other than the granting of a franchise. Second, by refusing Heather's request to participate in a franchise election, the city is practically forcing Heather to apply for a permit which it considers to be in violation of the city charter. Third, even if it applies for and is granted a permit, Heather would be exposing itself to economic risk if in the future some court determines that a franchise is required. These allegations suggest that Heather's reasonable participation in the cable television business is effectively precluded by Ordinance 532. Such preclusion, in our view, establishes injury in fact in this case. As we stated in *CF & I Steel Corp.*, 199 Colo. at 279, 610 P.2d at 92 (quoting *Wimberly*, 194 Colo. at 167, 570 P.2d at 538): "[T]he proper inquiry to be made as to the injury in fact requirement is 'whether the action complained of has caused or *threatens to cause* injury in

fact' to the plaintiff." (emphasis added in *CF & I Steel Corp.*).

■ The second prong of the test asks whether Heather has an interest or right protected by law. CTI and Cortez argue that Heather's allegations of injury are simply complaints of economic injury due to lawful competition.[7] We disagree. These allegations, which were admitted by the petitioners as true for the purpose of the cross-motions for summary judgment, raise serious issues as to what constitutes the proper operating authority for a cable television system in Cortez. By bringing a declaratory judgment action, Heather seeks to clarify its legal position in light of Ordinance 532 and the city's permit procedure. These matters significantly affect Heather's business operations as well as its interest in conducting those operations in a lawful manner.

■ Under the Colorado Corporation Code, section 7–1–101 *et seq.*, C.R.S.1973 (1973 and 1983 Supp.), Heather has the right to "conduct its business, carry on its operations," and "have and exercise all powers necessary or convenient to effect any of the purposes for which the corporation is organized." Section 7–3–101(1)(j) and (s), C.R.S.1973. Clearly, a municipality may not unlawfully deny a corporation its right to do business. We conclude therefore that Heather has standing because it has established an injury to its legally protected interest of conducting business in a lawful manner. Its concerns about the actions of the Cortez City Council in the permit-franchise issue are well suited to resolution pursuant to section 13–51–106.

### III.

The substantive issue in this case is whether Ordinance 532 grants a permit or a franchise to CTI. CTI argues that article X of the Cortez City Charter "establishes

---

7. We recognize that, in general, economic injury from lawful competition does not confer standing to challenge the legality of a competitor's operations. *See Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission,* 620 P.2d 1051 (Colo.1980); *Kornfeld v. Perl Mack Liquors, Inc.,* 193 Colo. 442, 567 P.2d 383 (1977); *KAKE–TV and Radio, Inc. v. City of Wichita,* 213 Kan. 537, 516 P.2d 929 (1973); *Hubbard Broadcasting, Inc. v. City of Albuquerque,* 82 N.M. 164, 477 P.2d 602 (1970).

two alternative methods whereby an individual may be granted the right to use or occupy public streets and alleys.... Section 1 ... authorizes the grant of a franchise by vote of the taxpaying electorate, while ... Section 8 allows the Cortez City Council to grant permits."[8] While we acknowledge the accuracy of this assertion, we also find it unresponsive to the question before us. If, as the district court concluded, Cortez has attempted to evade the public election requirement of section 1 by granting a franchise to CTI under the guise of granting it a permit, then Ordinance 532 is unlawful and must be struck down. Based on our analysis of what constitutes a franchise, and on that of other jurisdictions in the context of cable television, we conclude that Ordinance 532 grants a franchise to CTI without a vote of the taxpaying electors of Cortez.

### A.

The earliest discussion of what constitutes a franchise appears in *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 10 L.Ed. 274 (1839). In that case, the United States Supreme Court described a franchise as a "special privilege conferred by government upon individuals, and which do[es] not belong to the citizens of the country, generally, of common right." *Id.* (13 Pet.) at 595. We adopted the *Earle* definition in 1875, *see Denver & Swansea Railway Co. v. Denver City Railway Co.*, 2 Colo. 673 (1875), but few cases applied that definition until after article XX, section 4 was added to the Colorado Constitution in 1902. Section 4 created the City and County of Denver and authorized its residents to enact a home-rule charter. The last paragraph of section 4 stated:

"No franchise relating to any street, alley or public place of the said city and county shall be granted except upon the vote of the qualified taxpaying electors, and the question of its being granted shall be submitted to such vote upon deposit with the treasurer of the expense ... of such submission by the applicant for said franchise."

The purpose of this paragraph was to give the taxpaying electors of Denver absolute control over the granting of franchises.[9] *Ward v. Colorado Eastern Railroad Co.*, 22 Colo.App. 332, 125 P. 567 (1912), *aff'd*, 59 Colo. 589, 149 P. 1193 (1915).

In *McPhee & McGinnity Co. v. Union Pacific Railroad Co.*, 158 F. 5 (8th Cir. 1907), the Eighth Circuit analyzed two provisions in the new Denver City Charter, one dealing with franchises and tracking the constitutional language of article XX, section 4, and the other dealing with revocable permits. It outlined the factors to be considered in determining whether the grant of a privilege is a franchise or only a permit:

"A franchise is a right or privilege granted by the sovereignty to one or more parties to do some act or acts which they could not perform without this grant from the sovereign power." *Bank of Augusta v. Earle*, 13 Pet. 595 [10 L.Ed. 274] ....

"It is not, however, every privilege or permission granted by state or city to occupy or to use public rivers, highways, or streets that rises to the dignity of a franchise. A privilege granted by a city to a private party to occupy or use a portion of a public street temporarily ... is a license and not a franchise. The exact line of demarcation between franchises and licenses may not be clearly

---

**8.** Section 1 provides that "[n]o franchise shall be granted except upon the vote of the taxpaying electors." Section 8 provides that "[t]he Council may grant a permit at any time for the temporary use or occupation of any street, alley, or public place, provided such permit shall be revocable by the council at its pleasure, whether such right to revoke be expressly reserved in such permit or not." Neither "franchise" nor "permit" is defined in the city charter.

**9.** As we explained above, *see supra* note 2, article XX, section 4 of the Colorado Constitution is applicable to all home-rule cities by virtue of article XX, section 6, which provides in part: "[P]roceedings [under the charter of each home-rule city] shall be in reasonable conformity with sections 4 and 5 of this article." Meanwhile, each city and its citizens "shall have the powers set out in sections 1, 4 and 5 of this article."

drawn, but their general characters and limits are so well known and so clearly established that it is not difficult to assign many rights granted to the class to which they belong.

"A right or privilege which is essential to the performance of the general function or purpose of the grantee, and which is and can be granted by the sovereignty alone, such as the right or privilege of a corporation to operate an ordinary or commercial railroad, a street railroad, city waterworks or gasworks, and to collect tolls therefor, is a franchise....

"A right or privilege not essential to the general function or purpose of the grantee, and of such a nature that a private party might grant a like right or privilege upon his property, such as a temporary or revocable permission to occupy or use a portion of some public ground, highway, or street, is a license and not a franchise."

*Id.* at 10.

This court followed the *McPhee* guidelines in *Baker v. Denver Tramway Co.*, 72 Colo. 233, 210 P. 845 (1922). In that case, the Denver City Council passed an ordinance granting a permit for the construction of a street railway. The court decided that the ordinance was unlawful because it actually granted a franchise without a vote of the taxpaying electors. We stated:

"If it be a franchise, it cannot be taken out of the constitutional inhibition by calling it a license. That the right to use the streets of the city for street railroads is a franchise is a matter not open to dispute. If, by a permit of this kind, the city council can grant [rights which amount to a franchise], it can ... wholly defeat the purpose of the people who placed the restrictions as to franchises in the Constitution....

"We are of the opinion that the city council had no authority to grant to the defendant company the rights which the ordinance purports to give. To uphold such an ordinance is to approve a palpable attempt to evade a provision of article XX of the state Constitution.

"If the charter provision for revocable permits authorizes the council to grant permits, which are in effect franchises, such provisions are invalid as in contravention of the Constitution."

*Id.* at 242–43, 210 P. at 849. *See also Berman v. City and County of Denver,* 120 Colo. 218, 209 P.2d 754 (1949) (license-permit to operate buses and trolleys along Denver streets was an "abortive attempt" by city council to grant a franchise without a vote of the taxpaying electors).

In recent years, although we have not addressed the permit-franchise issue in the context of cable television,[10] we have indicated our continuing acceptance of the basic definition of "franchise" as "a special right or privilege granted by a government to an individual or corporation—such a right as does not ordinarily belong to citizens in general." *City of Englewood v. Mountain States Telephone & Telegraph Co.,* 163 Colo. 400, 405, 431 P.2d 40, 43 (1967). We have also upheld various permits or contracts which, in our opinion, did not "rise to the dignity of a franchise." *See, e.g., Ginsberg v. City & County of Denver,* 164 Colo. 572, 436 P.2d 685 (1968) (user agreement for stadium not a franchise); *Finney v. Estes,* 130 Colo. 115, 273 P.2d 638 (1954) (permit for city garbage collection not a franchise). We now conclude that Ordinance 532 created a franchise. By adopting Ordinance 532, the Cortez City Council granted CTI a special right or privilege to use the streets, alleys, and public places of Cortez for multiple ten-year periods. This right or privilege is essential to the performance of CTI's general business purpose. It does not belong

**10.** In *In re Mountain States Telephone & Telegraph Co.,* 73 P.U.R.3d 161, 171 (Colo.P.U.C. 1968), the Colorado Public Utilities Commission suggested that "[a] legal question probably exists as to whether the permission granted by anytown [, Colorado, for the placing of coaxial cable on its streets and alleys] should be in the form of a franchise or a license-permit. If a franchise is required, then if anytown is a home-rule city, the question may have to be submitted to a vote of the people."

to citizens in general and can only be conferred by the government. Under the circumstances, we are satisfied that Ordinance 532 grants a franchise, rather than a limited permit or license, to CTI.

## B.

Other jurisdictions have confronted the permit-franchise issue in the context of cable television. Almost without exception, these courts have held that cable television is a proper subject for the granting of a franchise. The most persuasive authority comes from the North Carolina Supreme Court, which decided in 1967 that city charter provisions governing franchise elections must be followed before cable television systems can be constructed. In *Shaw v. City of Asheville*, 269 N.C. 90, 152 S.E.2d 139 (1967), the Asheville City Council entered into a "Lease-License Agreement" for the installation, construction, maintenance, and operation of a cable television system. The North Carolina Supreme Court decided that the agreement awarded a franchise without the required vote of the taxpaying electors. "The fact that this agreement is denominated by the parties a 'Lease-License Agreement' is not controlling," the court explained. "Its nature, not its title, determines the power of the city to enter into it." *Id.* at 97, 152 S.E.2d at 144. Because the right granted was not a right possessed by the general citizenry, the court held that the agreement undertook to grant a franchise. "It follows," the court concluded, "that the agreement ... has not been adopted by the procedures which are prescribed by the city charter as conditions precedent to its validity. The agreement is, therefore, beyond the authority of the city and is void." *Id.* at 100, 152 S.E.2d at 146.

In *Kornegay v. City of Raleigh*, 269 N.C. 155, 152 S.E.2d 186 (1967), the Raleigh City Council entered into a "license, special privilege and franchise" without the passage of an ordinance and without a vote of the taxpaying electors. Once again, the North Carolina Supreme Court was not persuaded that charter provisions governing franchise elections could be avoided by labelling the grant a "license":

"Whether a grant of rights by a municipal corporation is the grant of a franchise does not depend upon the status of the grantee but upon the nature of the rights granted ....

"The grant by a city to a person, firm or corporation of the right to construct a city-wide system of towers, poles, cables, wires, and other apparatus in, along and over its streets and other public ways and to operate such systems for the profit of the grantee is clearly a franchise, for it is the grant of a right not held by all persons in common and which may be granted only by the act of the sovereign....

"We conclude that the rights which the city attempted to grant ... constitute a franchise, notwithstanding the fact that the [agreement] denominates them a 'license.' The grant is, therefore, void because the proceeding required by ... the city charter for the granting of a franchise has not been followed."

*Id.* at 161–62, 152 S.E.2d at 190. *See also City of Owensboro v. Top Vision Cable Co. of Kentucky*, 487 S.W.2d 283 (Ky.App. 1972), *cert. denied*, 411 U.S. 948, 93 S.Ct. 1926, 36 L.Ed.2d 410 (1973) (the right to operate a city-wide cable television system is a proper subject for the granting of a franchise); *People's Cable Corp. v. City of Rochester*, 70 Misc.2d 763, 334 N.Y.S.2d 972 (1972) (decision concerning cable television is within franchise provisions of city charter; ordinance granting nonexclusive license is invalid); *Borough of Scottdale v. National Cable Television Corp.*, 28 Pa. Commw. 387, 393 n. 2, 368 A.2d 1323, 1327 n. 2 (1977) (grant of right to use public ways to construct cable television system is a franchise); *Aberdeen Cable TV Service, Inc. v. City of Aberdeen*, 85 S.D. 57, 176 N.W.2d 738 (1970), *cert. denied*, 400 U.S. 991, 91 S.Ct. 455, 27 L.Ed.2d 439 (1971) (ordinance granting right to construct a cable television system is clearly a franchise as it confers upon a private corporation a right or privilege which does not belong to the general citizenry); *City of*

*Tyler v. Television Cable Service, Inc.*, 493 S.W.2d 322 (Tex.Civ.App.1973) (ordinance granting permit to use streets, alleys, and public ways for cable television system was in fact a franchise).

Each of these cases supports our conclusion that Ordinance 532 grants a franchise to CTI.

C.

The Cortez City Council enacted Ordinance 532 without a vote of the taxpaying electors. Since the right to use the streets and public ways of the city to construct, operate, and maintain a cable television system is a proper subject for the granting of a franchise, this procedure was unlawful. We hold, therefore, that Ordinance 532 violates article XX, section 4 of the Colorado Constitution and article X, section 1 of the Cortez City Charter.

The judgment of the court of appeals is affirmed.

DUBOFSKY, J., dissents.

DUBOFSKY, Justice, dissenting:

I respectfully dissent. Because I believe that the framers of Article X, § 1 of the Cortez City Charter and of Article XX, § 4 of the Colorado Constitution could not have intended to require a vote by the electorate before granting a cable television company the right to use the public streets, I would reverse the judgment of the court of appeals. While such grants may be labeled franchises, I believe the vote requirement was intended only to apply to grants of franchises to public utilities.

Recently the United States Supreme Court, upon considering the application of the Copyright Act to home videotaping of copyrighted programs, stated: "In a case like this ... we must be circumspect in construing the scope of rights created by a legislative enactment which never contem-plated such a calculus of interests." *Sony Corporation of America v. Universal City Studios, Inc.*, — U.S. —, —, 104 S.Ct. 774, 783, 78 L.Ed.2d 574 (1984). This is sound advice which should be applied in the resolution of this appeal, especially where the imposition of a voting requirement in this situation would serve little public purpose.

When construing a constitutional provision a court should give effect to the intent of the adopters at the time the amendment was adopted. *In re Interrogatories Propounded by Senate Concerning House Bill 1078*, 189 Colo. 1, 536 P.2d 308 (1975); *Board of Education v. Spurlin*, 141 Colo. 508, 349 P.2d 357 (1960). Article X, § 1 of the Cortez City Charter ("No franchise shall be granted except upon the vote of the taxpaying electors....")[1] tracks the language of Article XX, § 4 of the Colorado Constitution, added November 4, 1902, which provides in part:

> No franchise relating to any street, alley or public place of [a home rule city] shall be granted except upon the vote of the qualified taxpaying electors....

It is difficult to determine the intent of the adopters in 1902, but I believe that the above language was intended to apply only to grants of street franchises to public utilities, and that cable television is not a public utility.

To determine intent, a court should first examine the words used in the constitution and determine their natural and popular meaning. *A–B Cattle Co. v. United States*, 196 Colo. 539, 589 P.2d 57 (1978); *Prior v. Noland*, 68 Colo. 263, 188 P. 729 (1920). The word "franchise" has various meanings, both in a legal and popular sense. 12 E. McQuillin, *Municipal Corporations* § 34.04 (3rd ed. 1970). The majority defines "franchise" as "a special right or privilege granted by a government to an

---

**1.** Article X of the charter is entitled *Franchises and Public Utilities,* implying that § 1 of Article X applies only to franchises granted to public utilities. Another interpretation of the charter section is that since it tracks to a large extent the language of the constitutional provision, it is intended to require a vote when the constitution does. In any event, the charter can not require less than the constitutional provision authorizing the charter, and therefore, the intent of the adopters in adopting Article XX, § 4 is controlling in this case.

individual or corporation—such a right as does not ordinarily belong to citizens in general." While I do not disagree with this as a general definition, I find it of little use in the present controversy. Governments grant many rights and privileges that do not ordinarily belong to citizens in general. Attorneys are given the right to practice law, and physicians are given the right to practice medicine. Local governments approve the construction of buildings and allow newspapers to be sold from stands on public sidewalks. Clearly, Cortez is not required to submit every such grant to its citizens for approval.

Article XX provides no insight into the meaning intended for the word "franchise," and therefore, it is necessary to look elsewhere for a definition. In its strictest sense, a franchise is the right granted by the state to individuals to act as a corporation. 12 E. McQuillin, *supra*, at § 34.04. Section 4, however, pertains only to the granting of franchises relating to any street, alley or public place—commonly called street franchises. To determine what was intended by the adopters in 1902, it is useful to examine the usage of the term "franchise" made by contemporaries of the adopters.

In 1911, John Forest Dillon published the fifth edition of his treatise on municipal corporations. Included in his work was a chapter entitled "Street Franchises." He introduces the chapter by defining "franchises to use the public streets and highways" as "rights in public streets which are granted in furtherance of public purposes." J. Dillon, *Law of Municipal Corporations* § 1210 (5th ed. 1911). "The essential element of a franchise is that it should be a privilege, right, or power which the individual cannot exercise as of right, and which depends for its lawful existence upon a grant from the government, and ... a grant from the State is the foundation of every privilege or right to an individual or corporation to use the city streets for public or quasi-public purposes for individual profit." *Id.* Dillon proceeds to define corporations for public or quasi-public purposes as public utilities. He summarizes:

The courts have properly held the term *franchise* to be applicable to the right to construct, maintain, and operate railroads in the public streets and highways, or water mains and water works, gas pipes and lighting works, and poles and wires for the transmission and distribution of electricity.

*Id.* (emphasis in original) (footnotes omitted). At one point, Dillon refers to the relevant portion of Article XX, § 4 of the Colorado Constitution in a footnote following this sentence:

Other States ... have also embodied in their Constitutions provisions requiring the consent of the local authorities to the use of streets and highways, not only for railroad purposes, but in some instances for any form of public utility.

*Id.* at § 1223.

The notion that a street franchise relates to public utilities is contained in more recent literature. In McQuillin's work on municipal corporations one chapter is entitled: "The Franchise of Persons Using the Streets, and Its Incidents." It is introduced with these paragraphs:

This chapter embraces the law relating to grants to companies, individuals or partnerships to use the streets, and includes the rights and duties growing out of grants of the use of streets to water, gas, electric light, heat, power, conduit, telegraph, telephone, commercial railway, street railway, etc., companies commonly known as public service companies....

The law relating to the use of streets in the manner and for the purposes mentioned is of great practical importance because of the immense sums invested in public service companies and the intimate connection between the welfare of the inhabitants of the municipality and the enactment of wise statutes and ordinances granting franchises to public service companies to use the streets for water pipes, gas pipes, conduits for wires, telegraph and telephone poles, electric light poles, streetcar poles, the

tracks of commercial railroads and of street railroads, and also the control and regulation of such companies after they have once entered upon the use of the streets by virtue of a franchise.

12 E. McQuillin, *supra* at § 34.01. The discussion found in these treatises convinces me that when the term "franchise" as it relates to public streets was used by the framers of Article XX, § 4 of the Colorado Constitution it was meant to apply only to franchises granted to public utilities.

In addition, the cases cited in the majority opinion support this conclusion.[2] *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519, 10 L.Ed. 274 (1839) did not discuss street franchises. It applied the traditional concept of a franchise, the right to exist as a corporation. In *Ward v. Colorado Eastern Railroad Co.*, 22 Colo.App. 322, 125 P. 567 (1912), *summarily aff'd*, 59 Colo. 589, 149 P. 1193 (1915), the court of appeals held that the purpose of the relevant portion of Article XX, § 4 was to give absolute control over the granting of franchises to the taxpaying electors. In *Berman v. City and County of Denver*, 120 Colo. 218, 209 P.2d 754 (1949), this court characterized *Ward* as holding "that after the effective date of said article XX, the power to regulate utilities and their rates was transferred from the city council to the qualified taxpaying electors of the new municipality." 209 P.2d at 760.

The case closest in time to the amendment is *McPhee & McGinnity Co. v. Union Pacific Railroad Co.*, 158 F. 5 (8th Cir. 1907). *McPhee* recognized that the adopters of the amendment could not have intended that all privileges to use public streets be voted on by the electorate, and held that permission granted to a commercial railroad to lay and operate a railroad across or for a short distance upon a public street is not a franchise, but a license or permit. The court cited factors for determining whether or not a privilege granted is a permit or a franchise. "A privilege granted ... temporarily for the construction of a building upon an abutting lot, for a cab stand, an apple stand, or for any similar commercial purpose is a license and not a franchise." *Id.* at 10. The *McPhee* court also asserted that a right or privilege "not essential to the general function or purpose of the grantee ... is a license and not a franchise." *Id.* The court held that the right to lay railroad lines was not essential to Union Pacific's general purpose because it could operate its business without using the particular street under the general authorization granted it by the state.

It is instructive to note that a cable television company may conduct its business without the grant of a franchise or a permit.[3] Technology permits cable television to plug into telephone lines and transmit its signals over existing wires, thus avoiding the need for a franchise or a permit. *See City of New York v. Comtel, Inc.*, 57 Misc.2d 585, 293 N.Y.S.2d 599 (1968); *Re the Mountain States Telephone & Telegraph Company*, 73 P.U.R.3d 161 (Colo.P.U.C.1968). This is not commonly done because it is often less costly to string wires than to pay for the use of telephone lines.

The court in *McPhee* concluded that the evil at which this constitutional provision was directed was the power to grant "the general privilege commonly called a 'franchise,' frequently granted by cities to street railway companies, water, gas, electric light, telephone and other public utility corporations ... without the approving vote of the electors ... because there was more danger of a disregard of the public interests [from grants of these franchises]." 158 F. at 12. In *Finney v. Estes*,

**2.** The majority recognizes that not every grant of a privilege to use the street rises to the level of a franchise, but does not fully explore the intended meaning of the constitutional use of "franchise." The majority draws its line between permits and franchises, but McQuillin points out that a franchise is sometimes called a permit. 12 E. McQuillin, *supra,* at § 34.01.

**3.** At oral argument, counsel for CTI asserted that local governments usually grant cable television companies permits revocable at will.

130 Colo. 115, 273 P.2d 638 (1954), this court reiterated the conclusion in *McPhee:*

[T]he term franchise [is] ordinarily ... accepted as being applicable to the well-known services which are deemed public utilities.

273 P.2d at 640.

These cases establish that the term "franchise" was intended to apply to public utilities. They also point out the logic behind Article XX, § 4: the people knew that public utilities have monopoly powers and that a way to protect themselves against these monopolies was to control their use of the streets. McQuillin writes: "The monopoly idea is the basis of nearly all the law relating to franchises and public service companies." 12 E. McQuillin, *supra,* at § 34.01. This is the only logical rationale behind the vote requirement.

Once it has been established that "franchise" applies under our constitution only to public utilities, the next question is whether cable television is a public utility. I agree with those decisions holding that it is not. *See Greater Fremont, Inc. v. City of Fremont,* 302 F.Supp. 652 (N.D.Ohio 1968); *Re the Mountain States Telephone & Telegraph Co., supra; White v. City of Ann Arbor,* 406 Mich. 554, 281 N.W.2d 283 (1979); *City of Issaquah v. Teleprompter Corp.,* 93 Wash.2d 567, 611 P.2d 741 (1980); Annot., 61 A.L.R.3d 1150 (1975). Cable television is a commercial enterprise; it is not an essential service the termination of which could threaten the public welfare. As this case demonstrates, there is significant competition among cable television companies. Monopolies will not occur unless cable television companies are treated as public utilities. Requiring a vote before granting each new cable television franchise would in effect only result in a grant of monopoly status.

I also comment briefly on some implications of the majority opinion. A city requiring a competition by election between various cable companies may be subjecting itself to antitrust sanctions. In *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the United States Supreme Court held that Boulder's moratorium ordinance on the expansion of cable television was not exempt from antitrust scrutiny under the state immunity doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

Furthermore, cable television is a broadcaster of original programming. Requiring an election, paid for by the cable company, before granting a franchise restricts the cable television company's right to speak. A basic first amendment rule is that a regulation on speech must be examined to see if the governmental interest can be served by means less restrictive of first amendment rights. *See Heffron v. Int'l Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *NAACP v. Alabama,* 377 U.S. 288, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1963); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

For these reasons I would reverse the judgment of the court of appeals.